[Crim. No. 19819. Second Dist., Div. Two. Dec. 29, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM HOILAND et al., Defendants and Appellants.

## COUNSEL

Richard Solomon, Eiden, Imhoff, Schlosser & Solomon and John Cosgrove for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Alan V. Hager, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**COMPTON, J.**—Late in the afternoon of February 25, 1970, a riot erupted in the community of Isla Vista adjacent to the campus of the University of California at Santa Barbara. The unruly mob, numbering several hundred persons, among other things threw rocks at the windows and doors of certain businesses.

One of these business establishments was the Isla Vista branch of the Bank of America. During the afternoon attempts were made to enter the bank. These attempts included the breaking down of a plywood panel which covered the doors. A small fire was set just inside the door causing minor charring of the framing.

Later in the evening a large moveable garbage canister, known as a "dumpster" was pushed into the street in front of the bank and its contents were set afire. The dumpster was then pushed through the front door of the bank where it came to rest immediately inside the doorway. Once inside the bank it flamed intensely for a short while causing charring and smoke damage to the structure.

The fire in the dumpster was extinguished and it was removed. Shortly

thereafter a large crowd entered the bank through a rear door and proceeded to destroy records, tip over furniture and set small fires.

Some hours later, as a result of an additional arson, the bank was totally destroyed.

On June 3, 1970, the Grand Jury of Santa Barbara County indicted 15 persons for various felony and misdemeanor offenses arising out of these events.

Defendants William Hoiland, Robert Langfelder and Chris Sherman were among those persons indicted. Hoiland and Sherman were subsequently convicted by a jury of violating Penal Code section 405 (participating in a riot). The same jury also convicted Langfelder of participating in the riot and in a second count of inciting to riot (Pen. Code, § 404.6). The three named defendants appeal from those convictions.

We have been presented with only a partial transcript for the reason that the defendants do not challenge the sufficiency of the evidence.

The record does disclose, however, that both Langfelder and Hoiland were identified as part of the group which pushed the "dumpster" into the bank.

Thus, defendants lay no claim to innocence, their contentions on appeal attack certain aspects of the procedure which led to their conviction.

 The main thrust of this appeal is that the grand jury which indicted them was selected by a process which systematically excluded "young people under the age of 30" and that as to Sherman, who was 19 years of age, persons between 18 and 20 were improperly excluded from the trial jury.

The success of defendants' attack admittedly rests initially upon establishing that "young people" are a distinct and identifiable group which because of the common factor of age would share a distinctive "decisional outlook."

Defendants suggest that young people "sympathetic to lawful student demonstrations," would experience "different emotional responses" than those of their elders.

To suggest that the violence and depredation in which these defendants participated here, was in any way a "lawful student demonstration" is pure fantasy. To infer that responsible "young people" would, because of their distinctive "decisional outlook," react to this violence with less revulsion than persons a few years their senior, is to defame the majority of the nation's youth of whatever age.

Defendants claim that they were denied constitutionally guaranteed rights must rest upon a more solid basis than the contention that a sub-group of society based upon some factor common to the defendants and which might be sympathetic to them, was unrepresented on either the grand jury or the trial jury.

The number of such sub-groupings which any criminal defendant might be able to describe is limited only by the number of factors which can be enumerated in describing the personal profile of the individual.

The quality of *distinctness* which the defendants seek to attribute to the class of "youth" was discussed in one of the landmark cases in this area of the law.

"Throughout our history differences in race and color have defined easily definable groups which have at times required the aid of courts in securing equal treatment under the law. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. *When the existence of a distinct class is demonstrated and it is further shown that the laws as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.*" (Italics added.) (*Hernandez* v. *Texas,* 347 U.S. 475 at p. 478 [98 L.Ed. 866, 870, 74 S.Ct. 667].)

Against this background we examine defendants' contention concerning the grand and petit jurors in inverse order of their presentation.

### The Exclusion From The Trial Jury Of Persons Under 21 Years Of Age

Defendant Sherman alone makes the assertion that such exclusion was unfair, the other two defendants were themselves over 21 years of age.

■ That such exclusion was systematic and deliberate cannot be denied. It was mandated by the Legislature in Code of Civil Procedure section 198[1] which provides that a person, to be competent to act as a juror, must be of the age of 21 years.

Defendant Sherman contends that such provision is unconstitutional with respect to the exclusion of those age 18-20 years. This contention in light of an admission which he makes in his brief before this court is interesting indeed. That admission is that "eighteen years is the only *logical or reasonable* minimum age for jury service." (Italics added.)

---

[1] A similar exclusion is found in 28 United States Code section 1861.

Defendant seeks to buttress this assertion by reference to a number of statutes which grant privileges and impose responsibilities on persons over 18 years of age.[2]

The "logic and reasonableness" of the arbitrary selection of the age of 18 is not self-evident. Why not 17 or 19? Nothing in the way of a magical change in an individual occurs the moment the clock strikes the advent of any given birthday.

Historically, legislative bodies have adopted, admittedly arbitrarily, certain chronological ages as the basis for a number of significant determinations.

Interestingly enough, the Constitution of the United States limits those eligible to serve as a representative to persons over 25 years of age (art. I, § 2), those eligible to serve as a senator to persons over 30 years of age (art. I, § 3) and those eligible to serve as President to persons over 35 years of age (art. II, § 1).

Once it is conceded, as defendant has here, that any classification may properly be based on chronological age, then the selection of the particular age is a matter of legislative and not judicial concern.

The same legislative body that enacted many of the statutes relied upon

---

[2](1) Welfare and Institutions Code section 603 (mandatory referral to the juvenile court).

(2) 50 United States Code section 453 (registration for the draft).

(3) Civil Code section 25 (majority of married persons over 18).

(4) Civil Code section 4101 (right of 18-year-old woman to marry).

(5) Civil Code section 4101 (right of 18-year-old male to marry with consent of parents).

(6) Civil Code section 35 (disaffirmance of contracts).

(7) Civil Code section 25.5 (consent to blood donation).

(8) Civil Code sections 25.6 and 25.7 (consent to medical care).

(9) Penal Code section 308 (purchase of tobacco).

(10) Vehicle Code sections 12515 and 12516 (driving a motor vehicle for compensation).

(11) Probate Code section 20 and Civil Code section 1284.1 (capacity to make wills).

(12) 29 United States Code sections 203(1) and 212 (child labor law).

(13) Labor Code section 1172 (minimum wages and hours).

(14) Vehicle Code section 12507 (drivers licenses).

(15) . . . . . . . . . . . . . .

(16) Penal Code section 261 (statutory rape).
 Penal Code section 267 (abduction of females for purposes of prostitution).

(17) Insurance Code section 152 (purchase of automobile insurance).

(18) Penal Code section 273f (sending minors to immoral places).

(19) Penal Code section 653 (tattoos).

(20) Fish and Game Code section 3032 (hunting licenses).

(21) Civil Code section 33 (contracts).

(22) Code of Civil Procedure sections 414.10 and 416.60 (service of process).

by defendant as establishing the "logic and reasonableness" of the age of 18 also enacted Code of Civil Procedure section 198, which adopts 21 as the minimum age for jury service. We cannot say that such determination was any less "reasonable or logical."

Ample case and text law also support the view that such classification is not a violation of constitutional rights. (*George* v. *United States*, 196 F.2d 445, at p. 453, cert. den., 344 U.S. 843 [97 L.Ed. 656, 73 S.Ct. 58]; *Prince* v. *Massachusetts*, 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438]; *Hampton* v. *Ewert*, 22 F.2d 81; *Buelke* v. *Levenstadt*, 190 Cal. 684 [214 P. 42]; *People* v. *Curtiss*, 116 Cal.App.Supp. 771 [300 P. 801]; *United States* v. *Tantash*, 409 F.2d 227.)

The Constitution not forbidding the states to prescribe relevant qualifications for their jurors, (*Carter* v. *Jury Commission*, 396 U.S. 320 [24 L.Ed.2d 549, 90 S.Ct. 518]) the respective legislatures may make reasonable requirements. While the California Legislature has recently decided to lower the qualifying age to serve on petit juries to 18 years, it had not chosen to do so at time of trial. The trial court need not have anticipated such a change. (See *People* v. *Pearce*, 8 Cal.App.3d 984 [87 Cal.Rptr. 814]; *Datta* v. *Staab*, 173 Cal.App.2d 613 [343 P.2d 977]; *People* v. *Shipman*, 62 Cal.2d 226 [42 Cal.Rptr. 1, 397 P.2d 993]; *Douglas* v. *California*, 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814]; *Allied Stores of Ohio* v. *Bowers*, 358 U.S. 522, 528 [3 L.Ed.2d 480, 485, 79 S.Ct. 437].)

Suffice to say, such a change was not constitutionally mandated.

Whether such a change would in any event achieve the special understanding which the defendant seeks is conjectural to say the least.

In a recent federal case involving omission from jury panels of persons below age 25 and over age 70, it was observed: "We regard it as highly speculative whether the decisional outlook of such excluded persons would be different than that of persons a mere few years older, or a few years younger. The mere fact that there might be fewer young persons on the jury, and fewer of the oldest, than the exact proportion of such persons existing in the community does not of itself make a jury nonrepresentative." (*King* v. *United States*, 346 F.2d 123, at p. 124; cf. *Hoyt* v. *Florida*, 368 U.S. 57 [7 L.Ed.2d 118, 82 S.Ct. 159].)

Since defendant Sherman's claim of error is addressed to the constitu-

tionality of Code of Civil Procedure section 198, and not to any irregularity in the drawing of the petit jury, our conclusion that that section satisfies constitutional requirements dooms his attack to failure.

### Exclusion From the Grand Jury of Persons Aged 21-30

Prior to trial defendants sought to quash the indictments on the ground that the composition of the grand jury was constitutionally invalid.

The defendants contended that the selection process resulted in the systematic exclusion of "young people under the age of thirty, students and residents of Isla Vista" from representation on the grand jury which had returned their indictments.

In support of their contention they requested that a pretrial evidentiary hearing be held at which the judges of the Superior Court of Santa Barbara County would testify as to the manner of selection of their nominees for the grand jury. They also sought to question the jury commissioner as to the method of selection of the grand jury and to circulate among all grand jury nominees and members for the years 1961-1970, a two-page questionnaire in order to elicit certain statistical data. The trial judge denied these requests but permitted them to make an offer of proof which they did.

That offer of proof was as follows: "That the judges of the county choose basically persons from their own social economic background and tend to be of the same range of income and of the same race to the systematic exclusion of young people under the age of 30."

It is thus evident that youth was the primary ingredient of the class which defendants contend was improperly excluded. As an appendix to their brief, defendants have presented to us a description of Isla Vista taken from the "Report of the Santa Barbara Citizens Commission on Civil Disorders (September 15, 1970)." That report states in part that the overwhelming majority of the residents of Isla Vista are students at the University of California and that the community has "no separate political identity."

Thus the additional factors of "students" and "residents of Isla Vista" which defendants did not include in their offer of proof but to which they now allude are only an indirect means of identifying the class which is described as "young people under the age of 30."

In citing as error the court's refusal to permit an evidentiary hearing, the defendants rely on *Montez* v. *Superior Court,* 10 Cal.App.3d 343 [88 Cal.Rptr. 736].

*Montez* involved a claim of systematic exclusion of citizens of Mexican extraction from the Grand Jury of Los Angeles County.[3]

The defense had subpoenaed some 70 judges of the superior court of that county hoping to show that the judges by reason of birth, residence, wealth, social and professional associations and similar factors were unacquainted with eligible potential grand jurors of petitioner's class and had not made an adequate effort to overcome this alleged deficiency.

The trial court rejected the request to examine the subpoenaed judges. This court granted prohibition holding that such interrogation was a proper method for determining the factual question as to whether discrimination against the class did or did not exist.

The petitioners in *Montez* represented a distinct class who had historically been subjected to discriminatory practices. The only question in *Montez* was whether or not such discrimination had been practiced against the distinct class. *Montez* is thus clearly distinguishable from the instant case.

Defendants here would create a new class in society composed of "young people under thirty." The trial judge accepted as true defendants' offer of proof and we do so here. This obviates the necessity for an evidentiary hearing of the type required in *Montez*.

Penal Code section 893 provides that a person is competent to act as a grand juror only if he possesses the qualifications prescribed by section 198 of the Code of Civil Procedure. Our previous discussion concerning the constitutionality of the latter section fully answers defendants' contentions concerning the exclusion from the grand jury of persons 18-20 years of age.

In fact, our position here is stronger in light of the differing roles of the grand and petit jury. A grand jury determines only if there is sufficient evidence to warrant a trial. The petit jury decides ultimate guilt. Even if a grand jury fails to indict, an alternative method of prosecution is available, i.e., the filing of a complaint before a magistrate followed by a preliminary hearing. If the latter method is used, a defendant could obviously not complain that the magistrate was over 21 years of age. If the grand jury does indict, the sufficiency and competency of the evidence to support the indictment is reviewable pretrial under sections 995 and 999a of the Penal Code. In this way, the defendant is insulated against a frivolous indictment.

---

[3]The procedure for selection of grand jurors in Santa Barbara County as related by the trial judge consisted of nomination of 10 names by each judge, with the nominees to be approved by a majority of the judges. This procedure (except for the number of judges and the numbers nominated) is substantially similar to that set out in rule 16 of the Rules of the Superior Court of the County of Los Angeles.

The fact that the 18-20 age group was properly excluded, narrows the question to whether the selection process by design or otherwise resulted in the systematic and improper exclusion of a recognizable class of persons, to wit, *persons between the ages of 21 and 30.*

At this point it is appropriate to note that most of the attacks on grand jury composition have come in the federal system. A brief comparison of state and federal grand jury functions is appropriate. The difference between state and federal grand juries was recognized in *Brown* v. *Allen,* 344 U.S. 443 [97 L.Ed. 469, 73 S.Ct. 397] and also by a California court in *People* v. *Cohen,* 12 Cal.App.3d 298 [90 Cal.Rptr. 612]. *Cohen* noted that a California grand jury has a much wider mandate in the scope of its power to investigate, to be watchdogs of public trust and as an objective body reporting on the operation of government whereas a federal grand jury operates solely as part of the process of prosecution of crimes. It follows then that a state grand jury must be selected from persons whose capability is co-equal to the wider scope of the state function and federal cases should be read with this difference in mind.

In either jurisdiction however, the selection process in arriving at the membership of a grand jury should not discriminate against an identifiable group of qualified persons and the resulting grand jury must represent a cross-section of persons suitable to perform the duty. (See also *Norvell* v. *Illinois,* 373 U.S. 420 [10 L.Ed.2d 456, 83 S.Ct. 1366]; *People* v. *Shipman,* 62 Cal.2d 226, 232 [42 Cal.Rptr. 1, 397 P.2d 993]; *Douglas* v. *California,* 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814].)

Our comments concerning the lack of any clearly demonstrably unique attitudes on the part of "youth" as a class and in fact the difficulty in defining or isolating "youth" apply with equal force to defendants' attempt to create a separate class of persons between 21 and 30 years of age. In fact we might ask when does a person cease to be young and lose the sensitivity that defendants ascribe to that status? In the eyes of an 18 year old, 30 is ancient while in the eyes of a 50 year old, 30 is quite young.

To describe our modern society in a world of rapid change the restrained euphemism *pluralistic* is often employed. It connotes diversity among peoples on individual issues combined with the idea that there is unity on larger goals. To single out one group solely on the basis of a nine-year age bracket as having identifiable consistency in behavior, attitudes, beliefs or even prejudices within this pluralistic society is either to indulge in sheer presumption or to claim unique omniscience.

While there is undoubtedly a great focus today on the youth in terms of customs and fads tending to set them apart, there is also what has been

recognized as a "condition of youth" which seems more appropriate to the case in hand. This latter is the burden youth carries of striving for an education, fulfilling military service commitments and the great expenditure of time and energy in creating a family or an individual niche in society. This burden of youth ofttimes prevents them from accepting community obligations for which their elders have far more free time to spare. It is this last described "condition of youth" which often militates against their selection on grand juries rather than any invidious exclusion by their seniors. (*United States* v. *Leonetti,* 291 F.Supp. 461, at p. 477.)

Given the recognizable outward manifestations of "youth" there is no clear evidence that this mathematical segment of the population is a legally cognizable class requiring separate constitutional recognition. The trial judge found that there was an absence here of the quality of distinctness as required by *Hernandez, supra,* for the creation of a legally cognizable class, and we agree with his conclusion.

## ADDITIONAL CLAIMS OF ERROR

Defendant Langfelder was identified by two witnesses, Mr. Torresani and Mr. Wyatt, as a participant in the assault on the Bank of America.

He now contends that Torresani's and Wyatt's identifications of him were tainted by suggestive police procedures and that Wyatt was erroneously permitted to testify to prior misconduct on his part.

The witness Wyatt, a news reporter for a TV station, identified defendant Langfelder as the person who, early during the events of February 25, said to a group of people "Let's go over to the bank." Later Wyatt saw defendant smash the camera of a newspaperman, make the statement "Burn the bank," and then together with others, push the "dumpster" toward the bank. In the course of these events defendant spoke directly to Wyatt while jostling and kicking him in the apparent mistaken belief that Wyatt was a cameraman.

Wyatt's identification of defendant was aided by the fact that on the previous night he had observed defendant leading a crowd and throwing rocks at the bank.

At the sheriff's office on March 9, 1970, Wyatt gave an investigator a detailed physical description of several persons including defendant who had participated in the riot. He was then shown a large number of photos some of which he identified. None of the photos shown were of defendant Langfelder. Following this interview, as Wyatt was departing, another officer showed him a single photo of defendant Langfelder which he identified.

Defendant offered no objection at the trial to Wyatt's identification of him concerning the events of February 25, 1970, and he should not be permitted to raise the issue now. (*People* v. *Dobson,* 12 Cal.App.3d 1177, 1181 [91 Cal.Rptr. 443]; *People* v. *Hawkins,* 7 Cal.App.3d 117, 124 [86 Cal.Rptr. 428].)

In any event defendants' claim when examined in the light of all the circumstances does not persuade us that the identification procedure was so suggestive as to give rise to any likelihood of misidentification.

"[E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . . This is a claim which must be evaluated in light of the totality of surrounding circumstances." (*Simmons* v. *United States,* 390 U.S. 377, 383-384 [19 L.Ed.2d 1247, 1252-1253, 88 S.Ct. 967].)

A reading of Wyatt's testimony in light of his more than ample opportunity and reason to focus on and remember defendant Langfelder demonstrates that his in-court identification was based on a recollection of the events uninfluenced by the identification procedure at the sheriff's office.

 Nor was there any error, as defendant contends, in permitting Wyatt to recount his observations of defendant on the evening of February 24.

The test is one of relevancy. The issue was identity. A witness who observes a defendant engaged in conduct calculated to draw attention to himself may draw on that observation in buttressing his identification of the defendant on a subsequent occasion even though that prior conduct constituted a separate and distinct crime. The relevancy is patent. Case law is not to the contrary. (See *People* v. *Zankich,* 189 Cal.App.2d 54 [11 Cal. Rptr. 115]; *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974].)

Witness Torresani corroborated Wyatt in identifying defendant Langfelder as an active participant in the riot and specifically in the attack on the Bank of America.

On two occasions shortly following the burning of the bank, Mr. Torresani met with a police detective who showed him over 100 photographs of individuals including Langfelder. On both occasions Torresani failed to identify a photo of Langfelder.

A Mrs. Feeman who was present at the second showing and who had been present with Torresani at the "dumpster" incident picked from the group of pictures a photo of Langfelder. Torresani was not persuaded by Mrs. Feeman's identification. The detective suggested that Mrs. Feeman, who owned the apartment building where Langfelder lived, take Torresani to Langfelder's apartment to observe the defendant in person.

Torresani testified that he was in the process of installing cabinets in the apartment building and needed access to Langfelder's apartment in order to procure some necessary measurements. Torresani upon seeing Langfelder in the apartment recognized him as the person he had seen kicking in the plywood on the bank. Torresani later identified a picture of Langfelder although he had some difficulty with photographic identification apparently because of changes in Langfelder's beard.

Again the *Simmons* test of the likelihood of irreparable misidentification is at the core of the problem presented.

Procedural safeguards, such as those the courts have developed in regard to out-of-court identification procedures, are created for a purpose and not simply as a legal obstacle course which in each case must be run just for the sake of running it.

The purpose here is to prevent misidentification. When the absence of such a likelihood is apparent from the quality of the identification and the circumstances surrounding it the objective is achieved.

Torresani while hesitant to rely on photographs as a means of identification was certain in his identification of Langfelder both in court and out of court. His testimony bore the hallmark of the cautious witness who strives for accuracy.

His failure to identify the photo at the same time as Mrs. Feeman and his insistence on an in-person view are evidence of the conscientious and serious way in which he shouldered his responsibility.

It is thus apparent that he did not consider the suggestions of the detective as a mandate to identify the defendant.

Under the circumstances it is highly probable that Torresani would have had the opportunity to see defendant even in the absence of any suggestion by the officer. The officer was under no obligation to try to prevent such a confrontation with a suspect who was not in custody.

Additionally, it should be noted that witness Torresani withstood rigorous cross-examination which, in the final analysis, is the best device for demonstrating any misidentification that might exist.

Finally, the corroboration by Wyatt is not an insignificant consideration, in view of the fact that there was no connection of any kind between the two witnesses.

The judgments are affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 23, 1972.