**Indiana QUADRA et al.,**
**Plaintiffs,**

v.

**SUPERIOR COURT OF the CITY AND COUNTY OF SAN FRANCISCO et al., Defendants.**

**No. C–72–1689–CBR.**

United States District Court,
N. D. California.

Oct. 29, 1975.

---

Sidney M. Wolinsky, Public Advocates, Inc., Jon Van Dyke, Hastings College of the Law, San Francisco, Cal., for plaintiffs.

Thomas M. O'Connor, City Atty., George E. Krueger, Deputy City Atty., San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This case came before the Court on plaintiffs' and defendants' motions for partial summary judgment. Plaintiffs, a number of individual citizens of the City and County of San Francisco, challenge the constitutionality of the grand juries empaneled by the defendant judges of the Superior Court of San Francisco.[1] At an earlier stage in this litigation, this Court issued a Memorandum of Opinion and Order, 378 F.Supp. 605 (N.D.Cal.1974), disposing of certain motions to dismiss and motions for summary judgment. The issues squarely presented to the Court by the present motions is whether the analysis in that opinion has been overtaken and mooted by subsequent events.

Beginning on April 1, 1975, the defendant Superior Court judges, acting pursuant to California Penal Code Section 904.6, divided the formerly unitary San Francisco grand jury into two grand juries, one essentially criminal and the other essentially civil. That action by the defendant judges raises the novel legal question of the proper constitutional standards to be applied to a grand jury with none of the traditional criminal indictment powers, but with extensive civil investigative powers. Plaintiffs do not challenge the criminal grand jury which, under the recently inaugurated system, is chosen at random from those persons qualified as either civil or criminal trial jurors.

As stated in the earlier opinion, 378 F.Supp. at 612–613, this case does not involve a challenge to the constitutionality of California Penal Code Section 903.4, which vests in the Superior Court judges the discretion to select the grand jury from those individuals in

---

1. Also named as defendants are the executive officer of the Superior Court and the Superior Court itself.

the community with the requisite qualifications.[2] However, both in their briefs and in oral argument, plaintiffs have persisted in advancing arguments· inconsistent with this basic limitation to the scope of this Court's review of the San Francisco grand jury. Most numerous are arguments exploring in intricate detail the perceived inadequacies and dangers of a system of grand juror selection vesting discretion in the hands of the selectors.[3] As was clearly held in the earlier opinion in this case, not only does this Court lack jurisdiction to strike down the discretionary system so clearly authorized by California statute, but also there is abundant authority that a selection system that can be administered without discrimination, as this one can, is not on its face unconstitutional. *See, e. g., Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Akins v. Texas*, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L. Ed. 84 (1940). Therefore, this Court will treat these motions as related to the claim that the *results* of the grand jury selection system as applied in San Francisco are unconstitutional.

The first question for decision is whether the requirements set out in the Court's earlier opinion for establishing a *prima facie* case of discrimination in the selection of the grand jury are applicable to the civil investigative grand jury established by the defendants. In assessing plaintiffs' challenge to the uni-

2. The procedure under which the San Francisco grand jury has been. traditionally selected was described in detail in the Court's earlier opinion. 378 F.Supp. at 610–612.

During the past two years, the San Francisco Superior Court Judges have experimented with variations on this traditional theme. Prior to the selection of the 1974–75 grand jury, residents of San Francisco were told through the press that they could volunteer for grand jury duty and several hundred did so. The court clerks then randomly selected from this group of volunteers 101 names, a number equal to the number of persons nominated by the 26 judges. From the combined group of 202 persons, the clerks then selected 40 persons who were summoned to the Presiding Judge's courtroom for questioning, after which the Presiding Judge made his selections.

The selection of the 1975–76 "civil" or "investigative" grand jury has been through a process even more elaborate than those of earlier years. Eighteen of the judges nominated from 3 to 6 persons each to comprise a total of 79 persons and seven other names were added to the list, apparently taken from the trial jurors' list, but without explanation. From these 86 names, 30 were summoned as usual to report to Presiding Judge Drewes' courtroom on July 16, 1975. They were then questioned by Judge Drewes and one of the jury clerks. Judge Drewes excused 12 of the 30 and ordered 12 more names to be drawn from the list of potential jurors. This process continued until Judge Drewes had examined 60 potential grand jurors, after which he announced his selections.

The statutory minimal qualifications for grand jury service, which are not challenged here, are not particularly stringent. A person is competent for grand jury service only if he is a United States citizen aged eighteen years or older who has been a resident of California and of the county or city and county for at least one year immediately before being selected and returned; "[h]e is in possession of his natural faculties, of ordinary intelligence, of sound judgment, and of fair character"; and he is sufficiently knowledgeable of the English language. Cal. Penal Code § 893 (a). Under the statute a person is not competent to serve if he is serving as a trial juror in any court of the state, if he has been discharged as a grand juror by a state court within one year prior to the time for selection, if he has been convicted of "malfeasance in office" or of a felony or "other high crime", or if he is serving as an elected public officer. Cal.Penal Code § 893 (b).

3. Plaintiffs' arguments frequently are too wide-sweeping in their charges. A persistent theme of their memoranda is the danger of alleged conflicts of interest arising from a wide variety of sources. For example, plaintiffs go so far as to suggest that no .one having had any experience in city or county government can serve on the civil investigative grand jury. As a matter of policy, such experience might be a valuable asset for a grand juror, but, more fundamentally, the problem of conflicts of interest is one of state law rather than constitutional law.

tary grand jury system then in existence in San Francisco, the Court held that where a selection system provides an opportunity for discrimination,[4] "evidence showing a great disparity between the representation of a group over time on the grand jury and its percentage of the eligible population can be sufficient to establish a prima facie case." 378 F. Supp. at 614. Relying primarily on several Supreme Court decisions concerning school desegregation and the distinction between *de jure* and *de facto* segregation, defendants have argued, in effect, that the above analysis is incorrect for a constitutional challenge to *any* grand jury.[5] This Court finds the cases cited by defendants inapplicable to the question presently at issue and thus rejects the argument that there must be a showing of *scienter* or actual intent to discriminate in a case challenging the constitutionality of a grand jury. Therefore, it is necessary to turn to an analysis of the civil investigative grand jury in order to determine whether the above analysis should be applied to it as well as to the more traditional grand jury.

■ Not until the decision of the Supreme Court in *Carter v. Jury Commission, supra,* 396 U.S. at 320, 90 S.Ct. 518, could individual members of identifiable community groups excluded from grand jury service challenge the constitutionality of the grand jury even though they had not themselves been criminally indicted. Because all cases prior to *Carter* involved challenges by criminal defendants to the constitutionality of the grand juries that indicted them, judicial analysis, explicitly or implicitly, centered on the criminal indictment function of the grand jury. Although the possession by grand juries of powers other than the returning of criminal indictments is not apparently unusual, a grand jury limited to extensive civil investigative powers is unique.[6] Merely appending the label

4. As the Court held in the earlier opinion, the opportunity for discrimination does exist under the San Francisco selection system, both at the nominating and the final selection stage. 378 F.Supp. at 617. The defendant judges will almost always know the race, sex, occupation, and age of their personal nominees. The personal interview before the Presiding Judge presents another opportunity for *most of the individual characteristics* relevant to this litigaton to be known.

5. Defendants have also argued that the Court is bound by a decision of the Supreme Court of Georgia, *White v. State,* 230 Ga. 327, 196 S.E.2d 849, *appeal dismissed,* 414 U.S. 886, 94 S.Ct. 222, 38 L.Ed.2d 134 (1973), rejecting a challenge to the grand jury which had indicted the appellant. The defendants have interpreted that case as holding that "statistics showing a lack of proportional representation did not prove purposeful discrimination against blacks, women or young people." Defendants' Reply Brief at 7 n. 2. This reading of *White* is, however, insufficiently precise. The court noted that the appellant's statistical evidence "all related to persons on the *current* grand jury list" and concluded that:

"Purposeful discrimination is not shown by introducing evidence that as to a *single* grand jury or petit jury members of any large or identifiable segment of the community thereon, either negroes, women or young adults, are less in proportion than the proportion such identifiable segment bears to the population in general." 196 S.E.2d at 853 *(emphasis added).*

The appellant in *White* simply failed to present enough evidence to establish a *prima facie* case. The instant case is clearly distinguishable from White because plaintiffs here have supplied statistics on the composition of the San Francisco grand jury from 1970 to present showing pervasive underrepresentation. Although the statistics for the years prior to 1975 reflect the composition of the former unitary grand jury, they are probative here because the selection process for the unitary grand jury during that period was admittedly substantially the same as that used to select the 1975 civil investigative grand jury. The Court notes that certain statements of the Georgia Supreme Court are inconsistent with previous Supreme Court decisions, discussed at length in this Court's earlier opinion. The dismissal of an appeal from a state court decision for want of a substantial federal question does not constitute approval of every statement made by the state court.

6. Grand juries have always been investigative bodies. The very first English grand juries were established solely to perform investigative functions. *See* Note, "The Grand Jury

"grand jury" to an entity should not alone be sufficient to trigger the constitutional analysis applied to grand juries having dramatically different powers and functions. Thus, in a field of the law with an extensive body of precedent, this is a case of first impression, the resolution of which will require a comparison of the San Francisco civil investigative grand jury with the more traditional grand juries involved in other cases.

 Under their criminal responsibilities, grand juries perform both functions of investigation and indictment.[7] Although the criminal investigative role of the grand jury has been the subject of considerable controversy, it has been enthusiastically endorsed by the Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665, 687 n. 23, 92 S.Ct. 2646, 33 L. Ed.2d 626 (1973). The Supreme Court has also praised the indictment role of the grand jury as providing "a primary security to the innocent against hasty, malicious and oppressive persecution." *Branzburg v. Hayes, supra* at 687 n. 23, 92 S.Ct. at 2659, *quoting Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In performing these criminal functions the grand jury imports the common sense and decency of ordinary citizens into the criminal justice system, providing a buffer against possible prosecutorial excesses. In our pluralistic society, it is unfair and unconstitutional to exclude the

perspective of any of the identifiable groups in the population. This sentiment undoubtedly lies behind the Supreme Court's description of the jury as "a body truly representative of the community". *Carter v. Jury Commission, supra*, 396 U.S. at 330, 90 S.Ct. at 524, *quoting Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). The possibility for abuse and injustice is obvious when a criminal defendant is indicted by a grand jury from which members of the defendant's own group have been excluded. The Supreme Court has held that the exclusion of members of identifiable groups is of such significance that it can even be raised by a criminal defendant who is not a member of any of the excluded groups. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L. Ed.2d 83 (1972). The states are not constitutionally required to use grand juries as a part of their criminal justice systems, but, if they do elect to do so, they are required to insure that the grand jurors are selected without discrimination. *Carter v. Jury Commission, supra*, 396 U.S. at 330, 90 S.Ct. 518.

 Although the analogy between a grand jury with criminal investigative and indictment powers and one with only civil investigative powers is not complete, the Court concludes that it is sufficiently great that the same stringent constitutional standards should apply to claims of discrimination in either

as an Investigative Body," 74 Harv.L.Rev. 590 (1961). The federal system and many states do use grand juries for the purpose of indicting the criminally-accused, but the investigating role has always been important. Over half the states in the United States now bring most criminal charges by means of an information and a preliminary hearing, and limit the use of the grand jury to those matters that require extensive investigation and a greater than usual need to obtain private information. California was one of the first states to move in this direction, and California grand juries have for decades been primarily "investigative". *See Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). Colorado and

Wyoming now view the grand jury as such a useful investigating body that those states have passed legislation authorizing *state-wide* grand juries to be impaneled to examine wrongdoings that transcends county borders. Colo.Rev.Stat. §§ 13–73–101 through 13–73–108 (1973); Wyo.Stat. § 7–117.8 (1975). Congress also recognized the importance of grand jury investigations in the 1970 Organized Crime Control Act, which authorized the impanelling of special grand juries. 18 U.S.C. §§ 3331–3334.

7. The criminal investigative function of the grand jury is not separate from the indictment function, but is an integral part of it.

case. Although the particular application may differ, the essential genius of the grand jury is the same whether the area of concern is criminal or civil, for through the institution of the grand jury the state places ordinary citizens in key positions with respect to important governmental processes. The importance of the grand jury in the criminal justice system has been described above. In California, the mandate given to the civil investigative grand jury is broad, with powers commensurate to the task. Comparable to a perpetual ombudsman, the civil investigative grand jury occupies a strategic position in county government.[8] With its powers to compel testimony and to initiate impeachment proceedings, this grand jury can undertake wide-ranging investigations into inefficiency and corruption in county government. Operating primarily in nonjudicial areas, the civil investigative grand jury is nevertheless like the criminal grand jury in providing a mechanism by which the viewpoints of ordinary citizens can be brought to bear directly on governmental decision-making. This function is important not only because of the transmission of community

8. Statutes in California give local grand juries broad authorization to conduct investigations and to demand information. The basic power to subpoena information is given to the grand jury in Penal Code Section 939.2. It empowers the grand jury to initiate inquiries as it deems appropriate and to obtain any information necessary to resolve its concerns. *In re Peart*, 5 Cal.App.2d 469, 473, 43 P.2d 334 (1935). Persons called before the grand jury—including the persons under investigation—are obliged to testify and "can claim only the privilege protecting a witness from self-incrimination." *In re McDonough*, 21 Cal.App.2d 287, 288, 68 P.2d 1020 (1937), *aff'd*, 9 Cal.2d 90, 68 P.2d 1021 (1937).

California Penal Code Section 925 instructs county grand juries to inspect all county records, especially fiscal records, and a 1973 amendment, Penal Code Section 925a, extends this power to the records of cities within the county. The grand jury is also assigned the duty of investigating and reporting on the needs of all county officers, "including the abolition or creation of offices and the equipment for, or the method or system of performing the duties of, the several offices." Penal Code Section 928. Penal Code Section 926 authorizes the grand jury to employ an expert to assist them in these responsibilities at an annual expense up to $30,000 without the approval of the board of supervisors. Grand juries empaneled in even-numbered years are assigned the duty of investigating the "needs for increase or decrease in salaries of the county district attorney, and the auditor". The grand jury may also investigate the need for an increase in the salaries of members of the board of supervisors "as often as required". Penal Code Section 927.

Penal Code Section 919 assigns other important responsibilities to California grand juries. Subsection (a) provides for the investigation of the case of "every person imprisoned in the jail of the county on a criminal charge and not indicted". Subsection (b) directs the panel to inquire into the condition and management of prisons within the county. Perhaps most significant, however, is subsection (c), which provides for the investigation of "willful or corrupt misconduct in office of public officers of every description within the county".

Government Code Section 3060 vests in the grand jury an impeachment function. That section provides: "An accusation in writing against any officer of a district, county, or city, including any member of the governing board of a school district, for wilful or corrupt misconduct in office, may be presented by the grand jury of the county for or in which the officer accused is elected or appointed. An accusation may not be presented without the concurrence of at least 12 grand jurors." When such an accusation is made, it is to be delivered to the district attorney (Govt.Code Sec. 3062), who shall have a copy served upon the defendant, along with a notice to appear in superior court (Govt.Code Sec. 3063). The defendant is provided a trial by jury (Govt.Code Sec. 3070), and, if convicted, is removed from office (Govt.Code Sec. 3072). Although this procedure has seldom been used in recent years, it is a potentially powerful tool which has been construed broadly by the California courts: "The main purpose of the accusation * * * is to remove a person from public office for misconduct in such office; the misconduct charged need not necessarily include an act which would itself constitute a crime, and, if it does include such crime, the judgment on the accusation would not be a bar to a subsequent prosecution for such crime." *In re Burleigh*, 145 Cal. 35, 37, 78 P. 242, 243 (1904) (construing a similar predecessor provision); *see also People v. Harby*, 51 Cal.App.2d 759, 767, 125 P.2d 874 (1942).

values and concerns to the decision-making bodies, but also because of the opportunities for individuals to serve on such a grand jury.

■ In several cases, the Supreme Court's description of the grand jury suggests an importance transcending its role in the criminal judicial process. In *Smith v. Texas, supra,* 311 U.S. at 130, 61 S.Ct. at 165, the Court stated that racial discrimination in jury selection "not only violates our Constitution and the laws enacted under it but is at war *with our basic concepts of a democratic society and a representative government.*" (emphasis added). Similarly, in *Carter v. Jury Commission, supra,* 396 U.S. at 329–330, 90 S.Ct. at 523, the Court stated that: "Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds *than it may invidiously discriminate in the offering and withholding of the elective franchise.*" (emphasis added). The Supreme Court's reference in *Smith* to basic political values involved in grand jury selection is certainly consistent with this Court's conclusion that the civil investigative grand jury, with its significant impact on county government, should be subject to the same constitutional standards as a traditional grand jury. The Supreme Court's analogy in *Carter* to the franchise points up the fundamental personal and political value of having the opportunity to serve on the grand jury. As far as the individual citizen desiring to serve as a grand juror is concerned, exclusion from the civil investigative grand jury at issue here is as much an affront as exclusion from a more traditional grand jury. Therefore, the Court concludes that the same standards for establishing a *prima facie* case of discrimination should be applied to the civil investigative grand jury as applied to the former unitary grand jury.

Having determined the appropriate constitutional standard to apply to the civil investigative grand jury on these cross-motions for summary judgment, the Court must now apply that standard to the facts, if any, which are not in dispute in this case. The parties have had ample opportunity to develop and present the facts relevant to their respective cases, and, in the Court's opinion, the reasons stated in the first opinion for denying summary judgment no longer exist.

The Court must first determine which of the classes named by plaintiffs are "identifiable groups" such that their substantial underrepresentation on the grand jury can be the basis for a *prima facie* case of unconstitutional discrimination in selection. As the Court held in its earlier opinion:

> "Persons challenging grand-jury selection practices on the basis of statistical disparities must first establish which 'identifiable groups' have been excluded. *Hernandez v. Texas,* 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L. Ed. 866, 870. (1954). Such groups can be other than black and white racial groups. 'Whether such a group exists within a community is a question of fact', which can be answered, for example, by 'the attitude of the community.' 347 U.S. at 478, 479." 378 F. Supp. at 614.

■ Although in essence a question of fact, the determination that a particular class of persons does constitute an "identifiable group" can become firmly entrenched in prior case law. On this basis, the Court held in the earlier opinion that "non-white ethnic minorities" and "women" are identifiable groups. At the same time the Court held that plaintiffs had not alleged sufficient facts which, if true, would establish that the other named classes of "residents of

lower-strata neighborhoods," "low-income blue collar workers," and "young adults: persons between the ages of twenty-one and forty" constitute identifiable groups. Therefore, defendants' motions to dismiss as to those classes was granted.

Plaintiffs subsequently filed an amended complaint alleging systematic exclusion from the grand jury of five named classes. "Non-white ethnic minorities" and "women" were again named as in the original complaint, but several modifications were made in the descriptions of the three classes which had been dismissed. The class of "residents of lower-strata neighborhoods" was unchanged, but the last two classes of the original complaint were changed to "members of lower income families" and "young adults: persons between the ages of eighteen and forty." Plaintiffs alleged generally that each of the named classes is characterized by members who share certain views and who regard themselves as members of an identifiable group. Most importantly, they alleged that each of the named classes is in fact regarded by the larger community as an identifiable group. For purposes of ruling on defendants' motions to dismiss the amended complaint as to the last three classes, the Court treated plaintiffs' allegations of fact as true and denied the motions.

■ Despite having survived defendants' motion to dismiss as to the classes other than "non-white ethnic minorities" and "women", plaintiffs still have the burden of establishing that these classes are in fact identifiable groups. Because neither plaintiffs nor defendants have submitted any affidavits or other supporting materials directed to this question, summary judgment is inappropriate for the claims concerning the alleged exclusion of "residents of lower-strata neighborhoods," "members of lower income families,"

and "young adults: persons between the ages of eighteen and forty."

Turning now to the identifiable groups of "non-white ethnic minorities" and "women", the Court must determine whether plaintiffs have made out a *prima facie* case of discrimination, a determination which requires a consideration of the statistical information submitted by plaintiffs. This information was compiled from a variety of sources, including public records, questionnaires, and individual conversations and observations. While the Court is less than completely satisfied with it, the information reflects extensive effort by persons having some experience with the compilation of such data. Defendants have submitted no affidavits or other supporting materials attacking the sufficiency of plaintiffs' sources or methodology or suggesting that the composition of the grand jury varies from the picture presented by plaintiffs. Rule 56(e) of the Federal Rules of Civil Procedure provides in relevant part that:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Therefore, the question is whether plaintiffs' statistics reveal an underrepresentation of non-white ethnic minorities and women on the grand jury which is sufficiently substantial to support a *prima facie* determination of discrimination.

The following tables drawn from plaintiffs' statistics reflect the representation of non-white ethnic minorities and women on the San Francisco grand

juries over the last six years. The challenge in this case is to the civil investigative grand jury empanelled by defendants for 1975–1976, but the selection process used to choose the grand jurors for that grand jury is essentially the same used in the past to choose the unitary grand juries. It is appropriate to look at the composition of previous grand juries in order to determine whether the composition of the 1975–1976 civil investigative grand jury is a fair example of the result of the selection process as applied in San Francisco.

### NON–WHITE ETHNIC MINORITIES PERCENTAGE OF GRAND JURY
#### Total San Francisco Population: Non-White Ethnic Minorities = 38.8%

| | Nominees | Finalists | Jurors |
|---|---|---|---|
| 1970 | 17.9(–53.9) [9] | 3.3(–91.5) | 5.3(–86.3) |
| 1971 | 25.0(–35.6) | 30.0(–22.7) | 36.8(– 0.9) |
| 1972 | 28.2(–27.3) | 30.0(–22.7) | 26.3(–32.2) |
| 1973 | 31.9(–17.8) | 26.7(–31.2) | 26.3(–32.2) |
| 1974 (Nominees Only) | 19.8(–50.0) | 7.1(–81.7) | 10.0(–74.2) |
| 1975 (Nominees and Volunteers) | N/A | 15.0(–61.3) | 15.8(–59.3) |
| 1975 [10] | 20.9(–46.1) | 23.3(–39.9) | 26.3(–32.2) |

### FEMALE PERCENTAGE OF GRAND JURY
#### Total San Francisco Population: Female = 52.4%

| | Nominees | Finalists | Jurors |
|---|---|---|---|
| 1970 | 16.2(–69.1) [9] | 23.3(–55.6) | 5.3(–89.9) |
| 1971 | 15.3(–70.8) | 10.0(–80.9) | 10.5(–80.0) |
| 1972 | 20.3(–61.3) | 13.3(–74.6) | 15.8(–69.8) |
| 1973 | 23.3(–55.5) | 26.7(–49.0) | 26.3(–49.8) |
| 1974 (Nominees Only) | 31.7(–39.5) | 35.7(–31.9) | 40.0(–23.7) |
| 1975 (Nominees and Volunteers) | N/A | 35.0(–33.2) | 26.3(–49.8) |
| 1975 [10] | 34.9(–33.4) | 35.0(–33.2) | 21.1(–59.7) |

9. The figures in the parentheses represent a "rate of error" calculation suggested by the plaintiffs and adopted by the Court. This calculation provides an adjusted measure of under- or over-representation which is obtained by taking the difference between the percentage of a group's representation on the grand jury and the percentage of its representation in the population of San Francisco, and then dividing that difference by the group's percentage in the population. A figure of (–75) indicates, for example, that the group is underrepresented by three fourths or, in other words, that its representation on the grand jury is only one-fourth as large as its representation in the population. This calculation is useful because the importance of a difference of a given amount, for example, 10%, varies depending upon the magnitude of the group's representation in the population. A disparity of 10% constitutes a far more significant underrepresentation when the group comprises 12% of the population but only 2% of the grand jury (–83) than when the group comprises 60% of the population but only 50% of the grand jury (–20). Unfortunately, because this distinction has not been observed in the decided cases, it is difficult to rely on them directly in determining whether the underrepresentation is sufficiently substantial to support a *prima facie* case.

10. Civil Investigative Grand Jury only. Prior years reflect former unitary grand jury.

In the earlier opinion, the Court discussed at length the case authority[11] on the question of when a *prima facie* statistical case of discrimination is established, and it is unnecessary to repeat that discussion here. Although the underrepresentation of women has been more gross than that of non-white ethnic minorities, the Court concludes that the persistent underrepresentation of each of the two groups both as nominees and as grand jurors demonstrated by plaintiffs' statistics is sufficiently substantial to establish a *prima facie* case of unconstitutional exclusion.

Having concluded that plaintiffs have met the requirements set out in this Court's earlier opinion for establishing a *prima facie* case, it is necessary to consider the sufficiency of the explanations proffered by defendants. Defendants have suggested two explanations or justifications for the composition of the grand jury selected by them. First, they assert by affidavits that they did not exclude any potential grand jury because of membership in any of the identifiable groups at issue in this case. Second, they argue that higher qualifications are necessary for the civil investigative grand jury, thus making it permissible to choose the grand jurors from what they characterize as a "narrower base."

Defendants' first explanation can be summarily dismissed as inadequate to rebut a *prima facie* case of grand jury discrimination. As indicated earlier in this opinion, the Court rejects defendants' argument that an intention to discriminate must be shown. Plaintiffs have clearly stated throughout this litigation that they do not attribute any malevolent intention to defendants. But, discrimination can occur without such intention to harm, and it is clear that statements by those administering the selection process "that they included or excluded no one because of race [or other impermissible considerations] [does] not suffice to overcome * * * [a] prima facie case." *Turner v. Fouche,* 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970). *See also Carmical v. Craven,* 457 F.2d 582, 587 (9th Cir. 1971), *cert. denied,* 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972).

Defendants' second explanation requires more discussion, but it too must be rejected. Defendants attempt to justify the selections that they have made by arguing that the civil investigative grand jury can and should be a so-called "blue ribbon" panel, chosen from a "narrower base" defined by more rigorous standards. Plaintiffs oppose the notion of a specially qualified civil investigative grand jury, arguing that higher qualifications in education or experience will necessarily have a discriminatory impact on the same groups which have allegedly been excluded in the past. Apart from their principled objection to the notion of special qualifications in this context, plaintiffs further argue that defendants have not in fact applied such a system in selecting the grand jury. Because defendants have provided no objective statement of the necessary qualifications, plaintiffs argue that the defendants have merely chosen from among their friends and friends of friends in the guise of applying special qualifications.

A number of Supreme Court decisions have held that states may impose qualifications for jury service, whether petit or grand. *See, e. g., Carter v. Jury Commission, supra,* 396 U.S. at 332–333, 90 S.Ct. 518 (1970). Because of the special and demanding nature of the work of the civil investigative grand jury, it may be that the state is entitled to impose relevant higher qualifications for service on it. In *Fay v. New York,* 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947), the Supreme Court upheld the constitutionality of a New York

---

11. *See* 378 F.Supp. at 614–615. Particularly relevant is the discussion concerning the difference in the statistical cases necessary when the disparity results from subjective as opposed to objective tests. *Id.* at 615 n. 13.

statute imposing certain additional qualifications beyond those for general jury service for service on New York's "special jury."[12] The Supreme Court upheld the New York statute, finding that: "Each of the grounds of elimination is reasonably and closely related to the juror's suitability for the kind of service the special panel requires or to his fitness to judge the kind of cases for which it is most frequently utilized." 332 U.S. at 270, 67 S.Ct. at 1619. Presumably, the same test might validate qualifications imposed for service on the civil investigative grand jury if they were "reasonably and closely related to the juror's suitability".[13] Of course, qualifications designed only to exclude certain community groups or unrelated to the requirements of the task would not be permissible.

■ Defendants cannot, however, successfully rely on the argument that the higher qualifications allegedly necessary for service on this grand jury account for the pervasive statistical imbalance in the representation of identifiable community groups on the grand juries selected by them.[14] Defendants have not articulated any objective standards nec-

---

12. An intermediate California court has suggested that the California grand jury's responsibility of civil investigation might properly justify certain additional qualifications for grand jurors. Although the court was dealing with a unitary California grand jury, the thrust of its comment would certainly apply to the civil investigative grand jury now in existence in San Francisco. The court first noted that an earlier California decision, *People v. Cohen*, 12 Cal.App.3d 298, 90 Cal.Rptr. 612 (1970), had distinguished the California grand jury from its federal counterpart primarily on the basis of its wider mandate to investigate, to watch over the public trust, and to report objectively on the operation of government. The court concluded from these distinctions that: "It follows then that a state grand jury must be selected *from persons whose capability is coequal to the wider scope of the state function* and federal cases should be read with this difference in mind." *People v. Hoiland*, 22 Cal. App.3d 530, 539, 99 Cal.Rptr. 523 (1971) (emphasis in original).

13. The Court notes that Penal Code Section 926 authorizes the grand jury to employ expert assistance at least with respect to certain of its responsibilities. See note 8, *supra*.

14. The question raised by the possibility of special qualifications for the civil investigative grand jury is whether a statistical adjustment must be made to reflect the percentages of the various community groups possessing the requisite qualifications. Several Supreme Court decisions have indicated that such an adjustment is appropriate. *Cassell v. Texas*, 339 U.S. 282, 284–286, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Fay v. New York*, *supra*, 332 U.S. at 276, 67 S.Ct. 1613. Nevertheless, a very heavy burden of explanation is on any defendant who attempts to rebut a *prima facie* case of discrimination on the basis of such higher qualifications. The Supreme Court has repeatedly held that when grand jury selectors are given discretion in the selection of the grand jurors, the selectors have an affirmative duty "to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color [or other impermissible factors]." *Cassell v. Texas, supra*, 339 U.S. at 289, 70 S.Ct. at 633. When a person charged with that affirmative duty argues that there are inadequate numbers of persons in certain identifiable community groups with the requisite qualifications for grand jury service a court should accept the argument reluctantly. A showing is necessary both that the qualifications are in fact necessary to the performance of a grand juror's duty and that the composition of the grand jury does fairly reflect the pool of qualified citizens. The Supreme Court applied this approach in *Cassell v. Texas, supra*, 339 U.S. at 287–289, 70 S.Ct. at 632–633:

> "In explaining the fact that no Negroes appeared on this grand-jury list, the commissioners said that they knew none available who qualified; at the same time they said they chose jurymen only from those people with whom they were personally acquainted. It may be assumed that in ordinary activities in Dallas County, acquaintanceship between the races is not on a sufficiently familiar basis to give citizens eligible for appointment as jury commissioners an opportunity to know the qualifications for grand-jury service of many members of another race. An individual's qualifications for grand-jury service, however, are not hard to ascertain, and *with no evidence to the contrary, we must assume that a large proportion of the Negroes of Dallas County met the statutory requirements for jury service.*" (emphasis added.)

essary for service on the civil investigative grand jury. Although there are nebulous references in the affidavits of the defendant judges to a preference for civic experience and education, it is clear that the application of the so-called higher qualifications was done in a completely *ad hoc*, discretionary manner. In the absence of articulated standards, it is impossible for the Court to ensure that the standards are, in fact, related to the tasks facing the civil investigative grand jury. Similarly, it is impossible to determine what percentage of the various identifiable groups in the community have the requisite qualifications. Without that information, it is impossible to determine whether the grand jury represents "a cross-section of the population suitable in character and intelligence for that civic duty." *Brown v. Allen*, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953). Thus, while it may be true that defendants are entitled to select the civil investigative grand jury from a "narrower base", they have completely failed to come forward with the information necessary to define that base with any specificity. To hold that defendants have adequately rebutted the *prima facie* case of discrimination by their mere assertion that higher standards are being applied would immunize the defendants' action from constitutional scrutiny and drain the constitutional test of all vitality. The Court therefore concludes that plaintiffs' motion for partial summary judgment must be granted with respect to the classes of non-white ethnic minorities and women.

The question of the appropriate relief has not been adequately briefed by either side to this controversy. The prayer of plaintiffs' brief is primarily concerned with relief which would only be appropriate if the Court found the entire system of discretionary selection to be constitutionally infirm, which it has not. The defendants have not addressed the question of the appropriate relief at all. Therefore,

It is hereby ordered that plaintiffs and defendants submit by December 1, 1975, memoranda setting forth their view of the appropriate relief consistent with the conclusions of this opinion, including the disposition of the issues not resolved herein. Reply briefs will be due by December 12, 1975. A hearing on the matter will be scheduled for 9 A. M. on Thursday, December 18, 1975.