**Booker T. HILLERY, Petitioner,**

v.

**Reginald PULLEY, Warden, Respondent.**

**No. CIV S–78–594 LKK.**

United States District Court,
E.D. California.

May 12, 1983.

As Modified May 31, 1983.

William George Prahl, Deputy Atty. Gen., Sacramento, Cal., for respondent.

Clifford Tedmon, Sacramento, Cal., for petitioner.

## ORDER

KARLTON, Chief Judge.

Petitioner seeks a writ of habeas corpus. He challenges his 1962 Kings County Superior Court conviction for murder on the grounds that he was denied the equal protection of the laws because blacks were systematically excluded from the grand jury that indicted him.

This case has had a lengthy and often tangled history. *See Hillery v. Sumner,* 496 F.Supp. 632 (E.D.Cal.1980); *Hillery v. Pul-* *ley,* 533 F.Supp. 1189 (E.D.Cal.1982). Since my last Opinion and Order, an evidentiary hearing has been held and closing arguments submitted. Sad to say, the case is no easier now. After careful review and consideration of the facts, applicable legal principles, and the arguments of both parties, this court has concluded that the application for a writ of habeas corpus should be granted.

## I

## FACTS

A. *The California Proceeding*

In 1962, petitioner, a black man, was indicted by the Grand Jury of Kings County, California. Petitioner moved pretrial to quash the indictment asserting that blacks had been systematically excluded from the Kings County Grand Jury.

At the time of the motion, Kings County had only one superior court judge, the Honorable Meredith Wingrove, who presided at the hearing on the pretrial motion to dismiss. All previous Kings County Superior Court judges had died prior to the hearing. Judge Wingrove had been the sole Kings County Superior Court judge since 1956 and thus, at the time of petitioner's indictment, had selected all the potential jurors for the seven previous grand juries. Reporter's Transcript of Pretrial Hearing 41 (hereinafter R.T.). Petitioner asked Judge Wingrove to testify at the hearing, but the judge thought it improper and was not sworn as a witness.[1] The judge did, however, comment at various stages of the hearing on his selection of potential grand

---

1. Judge Wingrove's reticence may have been predicated upon the notion that a judge may not testify as to his or her thoughts underlying a particular decision. *See Fayerweather v. Ritch,* 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904); *Washington v. Strickland,* 673 F.2d 879 (5th Cir.1982). If so, his concern was misplaced. The applicable law permits a judge to testify under the circumstances posed by the motion. The primary rationale for this rule is that a judge's written orders or orally pronounced judgments should stand complete in themselves and not be undermined by after the fact testimony. *See Washington v. Strickland,* 673 F.2d at 902–06. In the present case, Judge Wingrove's testimony would not concern his thoughts while making a particular decision in a case at which he presided but, rather, would concern his process for selecting grand jurors. The United States Supreme Court has noted the testimony or the affidavit of judges in jury selection cases without finding any barrier to the consideration of such evidence. *See Castaneda v. Partida,* 430 U.S. 482, 498, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977); *Rose v. Mitchell,* 443 U.S. 545, 568, 99 S.Ct. 2993, 3006, 61 L.Ed.2d 739 (1979). Finally, had Judge Wingrove agreed to testify, it would have created no procedural problem. California law at the time of the pretrial hearing provided that a judge could be called as a witness, but that the judge in his or her discretion could order the

jurors, and ordered that his statements be considered as testimony.[2]

By law, potential grand jurors were selected by the superior court. The court was required to select twenty-five to thirty potential jurors annually, from which nineteen were randomly drawn to act as the grand jury. Those selected had to be competent to serve as jurors,[3] not exempt from serving,[4] in possession of their natural faculties, not infirm nor decrepit, and of fair character, approved integrity, and sound judgment. Additionally, the court was required to select potential jurors from each judicial district in the county in proportion to each district's population.

According to census figures, blacks constituted 1% or less of the Kings County population from 1900 to 1940. In 1950, census figures reflect that approximately 4% of the County's population was black; in 1960, approximately 5% of the population was black.[5] These figures are consistent with the evidence before the court that increasing numbers of blacks moved to Kings County in the post-World War II years, apparently as a result of the closure of the war plants in the Bay Area. See Deposition of Bessie Welcher at 9.[6]

Calculations introduced by petitioner, and accepted as valid by this court, indicate that

hearing postponed or suspended so as to permit it to proceed before another judge. See B. Witkin, *California Evidence* § 774 (1966), and the comment following Cal.Evid.Code § 703 (West 1966).

2. Since in addition to presiding, the judge was the trier of fact, it is difficult to know exactly who was being ordered to do what. Moreover, this process has created a difficult problem in resolving this case. Given that the statements were unsworn and not subject to cross-examination, it is unclear whether Judge Wingrove's statements may properly be considered in this proceeding, or were properly considered by the California Supreme Court. See *United States v. Rylander,* — U.S. ——, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521, (1983); *People v. Spriggs,* 60 Cal.2d 868, 872–75, 36 Cal.Rptr. 841, 389 P.2d 377 (1964). The parties have not, however, objected to this court's consideration of the judge's statements and, accordingly, the peculiar character of this "evidence" will not be considered further.

3. A person was "competent to act as a juror" if he or she was a U.S. citizen, 21 years old, a resident of the state and county for one year immediately before being selected, in possession of natural faculties, of ordinary intelligence, not decrepit, and possessed of sufficient knowledge of the English language. A person was incompetent if he or she did not possess the previously listed qualifications, was serving as a trial juror, had been discharged as a grand juror within the past year, or been convicted of malfeasance in office, any felony, or other high crime. See B. Witkin, *Cal.Crim.Proc.,* § 10 at p. 11 (1963); *Cal.Proc.* 2d, § 92 at p. 2923 (1971); *see also* the Historical Notes to Cal. Code of Civil Procedure §§ 198 and 199. Citations are to secondary sources because the statutes detailing the definitions of competency and incompetency, as well as the statute concerning exemptions, either appear in amended

form, or do not appear at all, in the official code. The court notes there is no dispute between the parties as to the statutory qualifications for grand jury service.

4. Penal Code § 897 (repealed by Stats.1971, c. 856, p. 1696, § 3) required the court to select, inter alia, only those not exempt from serving. Numerous and specialized exemptions were listed in Code of Civil Procedure § 200, which was amended some half-dozen times in the years following petitioner's indictment and was ultimately repealed. See Stats.1975, c. 593, p. 1310, § 2. At the time of petitioner's indictment, the statute included various occupational exemptions (teachers, lawyers, doctors, jailers, ministers, etc.) and an exemption for those who had served as a trial juror within the past year. See B. Witkin, *Cal.Crim.Proc.,* § 10 at p. 11 (1963); *Cal.Proc.2d,* § 93 at p. 2924 (1971). This court notes that the statutory requirement that the court select potential grand jurors from those not exempt from serving created an anomalous situation in that California law also provided that an exemption was a privilege to be exercised by the potential juror. See Cal. Penal Code § 1075 (repealed by Stats.1980, c. 81, p. 203, § 33); *Silman v. Reghetti,* 7 Cal. App.2d 726, 47 P.2d 291 (1935); *see also* Penal Code § 909.

5. In 1950 the total population of Kings County was reported to be 45,800; blacks numbered 1,819, or 3.97% of the population. In 1960, Kings County had a population of 49,944; blacks numbered 2,578, or 5.1% of the total.

6. The parties agreed on April 29, 1982, in the course of the evidentiary hearing held by this court, that because of special circumstances, the testimony of Mrs. Welcher and of Ann B. Cole could be taken by deposition and submitted in that form.

the percentage of blacks among those in Kings County age 21 or over was slightly lower than the percentage of blacks in the total county population.[7] For example, in 1960 approximately 4.7% of the county population over age 21, and therefore at least old enough for grand jury service, was black. See Petitioner's Exhibit 4. The percentage of blacks among those age 21 and over was also estimated for each year from 1900 through 1962. See Petitioner's Exhibit 6, Table 5.

Judge Wingrove stated at the hearing that he selected thirty (30) grand jurors annually. R.T. 17, 37, 106. He further said that in selecting potential grand jurors, he tried to comply with the statutory duty to choose jurors from each judicial district in rough proportion to each district's population. R.T. 37. The judge observed that he also tried to get a "good cross-section of the people ..." (R.T. 37), "a distribution of racial descents ... both sexes ... occupations, farmer, business men and various other types...." R.T. 38. Judge Wingrove further stated that he "endeavors, and I [sic] sure it is the policy of the law, to select, if possible, all possible people who

are interested in the community, civic minded, the better type of our citizens ...." R.T. 37. The judge described the person who he would feel is qualified for grand jury service as:

[S]omeone who has some substance, some interest in government, some interest in community activities, civil activities, people that take an interest that way. The Court also tries, so far as possible, to find in a Grand Jury [sic] someone who, in the Court's opinion, is intelligent, and also someone who is qualified. Actually, the Court spent not hours, but days every year trying to boil down a list of getting [sic] the best type of people possibly to be obtained in this county to sit on the grand jury.

R.T. 104. In short, Judge Wingrove asserted that he tried to select "a real representative group of people, of the better type." R.T. 38.

One fact clearly emerged at the hearing, a fact confirmed at the evidentiary hearing held by this court, namely, no black person had served on the Kings County Grand Jury since Kings County was organized in 1893.[8]

7. The State asks the court to declare a "mistrial" because one of petitioner's attorneys selected the census data and devised a method for determining the percentage of blacks among those over 21. The State asserts that by virtue of the attorney's function, the court has been placed in some kind of "all but impossible" position. See Final Argument at 3. The argument is without merit. Petitioner obviously wanted to introduce data concerning the percentage of blacks over 21. Unfortunately, the census reported age characteristics for only two groups—whites and non-whites. Non-whites included blacks and other races. In order to estimate the number of blacks over 21, one of petitioner's attorneys used census data to determine the ratio of blacks to other non-whites in Kings County. The attorney then assumed that the ratio would be the same for the group of non-whites over 21, applied the ratio, determined the approximate number of blacks over that age (the figure arrived at was 1,308), and then determined that blacks constituted about 4.7% of the 26,677 people in Kings County over 21. See Exhibit 4. This appears to be a logical solution to the problem. The figures used by petitioner's attorney and the method employed, as well as the calculations themselves, are not dependent upon the credibility of the witness, and are subject to direct

verification or impeachment by the State. They stand unrefuted in the record.

8. The California Supreme Court, in affirming petitioner's conviction, characterized the statement that no blacks had ever served on the Kings County Grand Jury as a fact. See People v. Hillery, 62 Cal.2d 692, 709, 44 Cal.Rptr. 30, 401 P.2d 382 (1965); Hillery v. Pulley, 533 F.Supp. 1189, 1201 n. 25 (E.D.Cal.1982) (California Supreme Court's finding entitled to a presumption of correctness under 28 U.S.C. § 2254(d) ). A review of the record shows that most of the witnesses called by petitioner at the pretrial hearing on his motion to quash the indictment stated they had no knowledge of or could not recall the racial background of past grand jurors. See R.T. 24–25, 31, 41, 48, 69, 75, 78, and 86. Two witnesses, however, gave testimony indicating that no black had served on the grand jury in a long number of years. Orvie Clyde, who had lived in Kings County since 1930 and had been its sheriff since 1941, testified that he had become acquainted with people who served on various grand jury panels, and that none of these people were black. See R.T. 81–82. Similarly, Frank Newton, who had worked since 1916 in the advertising department of the Hanford Sentinel, stated that he

Judge Wingrove acknowledged several times during the course of the hearing that since becoming the Superior Court judge in 1956 he had not selected a black for the grand jury panels. R.T. 38, 64, 103. He explained he had "never had a colored person on the panel, not through lack of desire, but purely through lack of ability to find one that the Court feels would make a proper Grand Juror." R.T. 38. The judge denied that discrimination was the reason. He said, "[t]here certainly never has been, as far as the present Court is concerned . . . any systematic exclusion of anybody from the Grand Jury because of any racial descent . . . ," R.T. 39, and that "[a]s far as the present Court is concerned . . . there has never been any feeling of discrimination of any kind . . . against anyone . . . ." R.T. 60; *see also* R.T. 40–41, 105. The judge also expressed, more than once, his anger at the claim of systematic exclusion. He stated, for example, "the court resents any accusations of discrimination shown by this Court . . . ," R.T. 65, and that "the Court very stoutly denies and refutes and feels somewhat incensed with the implication that there has been any discrimination . . . ." R.T. 64; *see also* R.T. 36 and 39.

Judge Wingrove asserted during the course of the hearing that in early 1962 he had asked Hugh Goodwin, petitioner's trial counsel, if he knew any colored people in Kings County that would make good grand jurors. R.T. 38. Judge Wingrove claimed that Goodwin mentioned a name or two, R.T. 103, and that he then "checked [the] names through the Clerk's office trying to find out someone who was qualified and was not on the trial jury panel and so forth, and might be available, might have the time to devote to the matter. Frankly, the Court was unable to find anyone." R.T. 38.

The judge specifically remembered inquiring about a black man named Lloyd Welcher. R.T. 103. He said that he considered Welcher competent to serve but determined that Welcher was regularly employed and therefore did not submit his name, because "you can't expect to put somebody on the Grand Jury who is going to have to interfere with his employment too much." R.T. 103.

Judge Wingrove also observed that "ordinarily the main—the only function of the Grand Jury in this county over the past few years . . . is to observe and has been to check on county government, county offices, and the matter of criminal indictments, has been very, very minor indeed." R.T. 107; *see also* R.T. 56. The Kings County Grand Jury had returned only two indictments, including petitioner's, in the seven years Judge Wingrove had been on the bench. R.T. 56–57. The judge also noted that blacks had served on Kings County trial juries. R.T. 39.

The County Clerk also testified at the pretrial hearing. The substance of that official's testimony was that it was the Clerk's duty to check the list of potential grand jurors selected by the judge against the voter registration affidavits in order to determine, inter alia, whether any were statutorily exempt from service. The Clerk said the registration affidavits contained no indication of a person's racial status and that no one had ever asked her to determine the race of a prospective grand juror. R.T. 90–92.

At the conclusion of the pretrial hearing, Judge Wingrove denied petitioner's motion to quash the indictment, stating, "the evidence wholly fails to sustain the contention that there was a systematic exclusion of colored people from the Grand Jury in

had met or known a number of people who had been members of various grand juries, and that he did not remember any that were black. *See* R.T. 95–96. The testimony of these two witnesses was uncontradicted. The finding of the California Supreme Court that no black had ever served was apparently inferred from this evidence. The finding is supported by the statement of Ann B. Cole in a deposition filed in this court. Mrs. Cole is black and was

selected for the Kings County Grand Jury in 1963, the year after petitioner's indictment. Mrs. Cole stated that she was told that she was the first black person to serve as a grand juror in Kings County. *See* Deposition of Ann B. Cole at 6. The court is satisfied that this evidence taken as a whole represents a proper factual foundation for a finding that no black had served on a grand jury in the history of the county.

**1234**

Kings County ...." The plaintiff was convicted in the subsequent trial. That conviction was affirmed as was the denial of the motion to quash. *See People v. Hillery,* 62 Cal.2d 692, 708–10, 44 Cal.Rptr. 30, 401 P.2d 382 (1965).

### B. *The Federal Proceedings*

As noted above, after several false starts, this court ordered an evidentiary hearing. At the evidentiary hearing ordered by this court, additional evidence was received. Hugh Goodwin, petitioner's attorney during the California proceedings, testified. Goodwin, a black man, has resided in the Central Valley since 1905 and has practiced law there since 1949. He handled a number of cases in Kings County and is familiar with the area and its history. From Goodwin's testimony, this court finds: (1) there were in Kings County in the 1950's blacks eligible for grand jury service, even given the limited literacy and education level that prevailed among the black population at the time; (2) that grand jury service would have been a hardship but that some blacks, if asked to serve, would have made the sacrifice; and (3) that Judge Wingrove's desire to select the "better type" of people for grand jury service meant that blacks, both because of their race and their socioeconomic status, were overlooked.

This court also finds, from evidence introduced as a result of the evidentiary hearing, that after petitioner raised the issue of systematic exclusion in 1962, blacks began to appear on the Kings County Grand Jury. *See* Deposition of Bessie Welcher at 7–8; Deposition of Ann B. Cole at 6–7. Although the record is ambiguous with regard to how many or when blacks served on the Kings County Grand Jury after 1962, it is clear that Ann Cole, a black, was selected by Judge Wingrove in 1963. It is also apparent that the percentage of blacks among those age 21 or over in Kings County was slightly lower in 1970 than it was in 1962. *See* Petitioner's Exhibits 4 and 6.

Petitioner also introduced evidence concerning the statistical probability that the absence of blacks from the Kings County Grand Jury could have occurred by chance. The nature and effect of this evidence will be discussed in the course of my examination of the merits of this case. *See* § IV C, *infra.* I now turn to a brief discussion of the nature of this action.

## II

### THE CLAIM

■ Petitioner contends that his right to equal protection of the law, guaranteed by the Fourteenth Amendment, was violated because blacks were excluded by reason of their race from the grand jury which indicted him. For over 100 years, it has been held that a criminal conviction cannot stand if it is based on an indictment returned by a grand jury from which members of an identifiable group to which the petitioner belongs have been excluded because of their race. *See, e.g., Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879); *Neal v. Delaware,* 103 U.S. 370, 26 L.Ed. 567 (1880); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). A criminal defendant is entitled to require that a "[s]tate not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice." *Alexander v. Louisiana,* 405 U.S. 625, 628–29, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972). A claim of discrimination in grand jury selection is cognizable on federal habeas and will, if proven, support the issuance of a writ setting aside a state conviction and ordering an indictment quashed. *See Rose v. Mitchell,* 443 U.S. 545, 550–64, 99 S.Ct. 2993, 2997–3004, 61 L.Ed.2d 739 (1979) and see discussion at § VI, *infra.* Thus if petitioner prevails on the merits this court can and should issue such a writ.

Before discussing the merits of this case, however, I must consider a preliminary matter. I must determine whether the state trial court's conclusion that there was no systematic exclusion of blacks from the Kings County Grand Jury, and the California Supreme Court's affirmance of that ruling, are factual determinations to be ac-

corded a presumption of correctness pursuant to 28 U.S.C. § 2254(d).

## III

### THE PRESUMPTION OF CORRECTNESS

Title 28, § 2254 provides that a federal court shall, under the circumstances therein provided, accord to relevant factual findings made by a state court a presumption of correctness. As the Supreme Court recently emphasized, 28 U.S.C. § 2254 was:

> [I]ntended not only to minimize [the] inevitable friction [between state and federal courts occasioned by the creation of federal habeas corpus jurisdiction] but also to establish that the findings made by the state-court system "shall be presumed to be correct" unless one of seven conditions specifically set forth in § 2254(d) was found to exist by the federal habeas court. If none of those seven conditions were found to exist, or unless the *habeas* court concludes that the relevant state-court determination is not "fairly supported by the record," "the burden shall rest upon the applicant to establish *by convincing evidence* that the factual determination by the State court was erroneous."

*Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981) (emphasis in original). Thus my first task is to determine whether there were findings of fact relevant to the issue tendered herein and, if so, whether they are entitled to a § 2254 presumption of correctness.

■ It seems clear that, both as a matter of logic (*see Famolare, Inc. v. Edison Bros. Stores, Inc,* 525 F.Supp. 940, 943 n. 3 and 4 (E.D.Cal.1981), and as a matter of decisional law, the ultimate question of whether there was an intent to discriminate is a factual one. *See Norris v. Alabama,* 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935); *Pierre v. Louisiana,* 306 U.S. 354, 358, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1939). Moreover, it also seems clear that Judge Wingrove's determination that there was no systematic exclusion of blacks is equivalent to a finding that there was no intentional or purposeful racial discrimination. *See Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). This court must therefore determine if Judge Wingrove's finding is to be accorded a presumption of correctness. After a careful review of the record, and for the reasons that follow, this court holds that the superior court hearing at which the determination in question was made was not "a full, fair, and adequate hearing" within the meaning of 28 U.S.C. § 2254(d)(6). Accordingly, that determination cannot be presumed correct.

The determination that Judge Wingrove's finding cannot be accorded a presumption of correctness is necessitated by the fact that, under the procedure adopted at the pretrial hearing, the trier of fact was called upon to judge his own conduct. As I shall now explain, this process deprived the petitioner of a requisite to a full and fair hearing, to wit an impartial adjudication. In the absence of such an adjudication, the factual determinations made cannot be presumed correct. *See* 28 U.S.C. § 2254(d)(2) and (6).

The right to an impartial judge is a basic and essential component of any full and fair hearing. *See Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1463–64, 43 L.Ed.2d 712 (1975). The doctrine serves two paramount concerns of our judicial system—actual fairness and the appearance of fairness. "To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). As the selector of the grand jurors which indicted petitioner it was Judge Wingrove's very conduct which was in issue during the superior court hearing. Accordingly, as the person who heard petitioner's pretrial motion to quash the indictment, Judge Wingrove had to rule on the propriety of his own conduct. This situation alone would be sufficient to cast doubt on the apparent fairness of the proceeding; petitioner, however, need not merely rely on the appearance of fairness.

The record of the pretrial hearing, as reviewed in the statement of facts, demonstrates that Judge Wingrove was in fact neither a neutral nor disinterested adjudicator. He expressed in certain terms his resentment of petitioner's systematic exclusion claim. Throughout the hearing he reiterated that he had not discriminated against anyone in selecting grand jurors. While these statements were perhaps a natural reaction to petitioner's claim, they highlight Judge Wingrove's position of having to both judge and defend his own record as a grand juror selector against a claim of racial discrimination. The probability of actual bias in this situation seems obvious. In sum, Judge Wingrove's impartiality both as a matter of appearance and fact may reasonably be questioned. For this reason, petitioner's pretrial hearing was not fair within the meaning of section 2254. *See Guice v. Fortenberry,* 661 F.2d 496, 507 (5th Cir.1981) (en banc); *see also Rose v. Mitchell,* 443 U.S. 545, 563, 99 S.Ct. 2993, 3003, 61 L.Ed.2d 739 (1979). Under such circumstances, the trial court's finding that blacks were not systematically excluded from the Kings County Grand Jury is not entitled to a presumption of correctness. This ruling, however, does not dispose of the issue. This court must also consider whether the California Supreme Court's affirmance of Judge Wingrove's ruling is to be accorded a presumption of correctness.

On appeal from his conviction, petitioner argued to the California Supreme Court that the trial court "erred in denying his motion to quash the indictment on the grounds that members of his race were systematically and purposefully excluded from the grand jury which indicted him." *People v. Hillery,* 62 Cal.2d 692, 708–09, 44 Cal.Rptr. 30, 401 P.2d 382 (1965). The California Supreme Court reviewed the evidence in the record and rejected petitioner's contention stating that, "the foregoing rec-

ord amply supports the trial court's determination that there was no systematic exclusion of Negroes from the grand jury which indicted defendant." *Id.* at 710, 44 Cal.Rptr. 30, 401 P.2d 382. The question is whether this disposition constitutes a finding of fact within the meaning of 28 U.S.C. § 2254(d).

The United States Supreme Court has recently held that a federal court of appeals must accord a § 2254 presumption of correctness to a factual determination of a California Court of Appeal, when that determination was made after a hearing comporting with that section's standards. *Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). Nonetheless, I do not believe that such a presumption can be accorded in the case at bar since the California Supreme Court did not make a factual finding. Indeed, under California law the Supreme Court of California could not, under the circumstances of this case, make a factual finding to which such a presumption attaches.[9]

A fundamental principle of the California court system is that the reviewing court's function is to correct errors of law and not to pass on questions of fact. California Constitution, Art. VI, § 11; *see* 6 B. Witkin, *California Procedure* § 209, 2d Ed. (1971); *People v. Hills,* 30 Cal.2d 694, 701, 185 P.2d 11 (1947); *Tupman v. Haberkern,* 208 Cal. 256, 262–63, 280 P. 970 (1929). It is true that under California law, *see* Cal.Code of Civ.Pro. 909, an appellate court may, under very restricted circumstances, make additional findings of fact. *See Tupman v. Haberkern,* 208 Cal. 256, 280 P. 970; *see also* 6 B. Witkin, *California Procedure* §§ 565–573. Under appropriate circumstances, then, such findings by appellate courts are entitled to a presumption of correctness. *Sumner v. Mata,* 449 U.S. at 546–47, 101 S.Ct. at 768–69. The question tendered here is, whether the language quoted

---

9. In *Sumner v. Mata,* 449 U.S. at 546, 101 S.Ct. at 768, the Court focused on the question of whether an appellate court proceeding satisfied the requisites of a hearing under § 2254 and apparently assumed that an observation that "the facts of the present case do not adequately

support respondent's claim" was a factual finding. Whatever was true in *Sumner v. Mata* as I shall point out in the body, here we deal with the California Supreme Court's legal conclusion and not a factual determination.

above is such a finding of fact. From the clear terms of the court's opinion, it is not. Indeed the California Supreme Court did not even purport to independently determine that blacks were not systematically excluded from the Kings County Grand Jury. That determination was made by the trial court. Here, unlike the language at issue in *Sumner v. Mata,* the California Supreme Court's language cannot even be plausibly read as a factual finding. On the contrary, the state's high court merely decided there was substantial evidence in support of the trial court's determination and thus it was not legal error for the trial court to deny the motion to quash. The court's statement that "the record amply supports the trial court's determination that there was no systematic exclusion of Negroes . . . ," *People v. Hillery,* 62 Cal.2d at 710, 44 Cal.Rptr. 30, 401 P.2d 382, is thus a legal conclusion. As such, it is not entitled to a presumption of correctness in this proceeding. *See Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980).

■ For the reasons noted above, this court holds and finds that, since the state court pretrial hearing on petitioner's claim was not fair within the meaning of 28 U.S.C. § 2254(d)(6), the factual determination made by Judge Wingrove at the hearing's conclusion is not entitled to the statutory presumption of correctness. The statutory presumption is not applicable to the California Supreme Court's affirmance of the trial court's determination because that court's affirmance is a legal conclusion and not a factual finding. I thus find that no presumption of correctness attaches to the relevant inquiry. Where the presumption of correctness provided by section 2254 does not apply, the petitioner must establish the existence of discriminatory intent by a preponderance of the evidence. *Sumner v. Mata,* 449 U.S. at 551, 101 S.Ct. at 771. With this standard in mind, the court now turns to a consideration of the merits.

## IV

### THE PETITIONER'S CASE

#### A. *The Prima Facie Mode of Analysis*

To prevail, petitioner must prove that intentional or purposeful racial discrimination was a motivating factor in the absence of blacks from the grand jury that indicted him. Claims of discriminatory jury selection have historically been analyzed by first determining whether a prima facie case of discrimination has been established, and, if so, whether the prima facie showing has been rebutted. *See, e.g., Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The Supreme Court, however, in a recent employment discrimination case, held that courts should focus on the ultimate question of discrimination, and not on whether a prima facie case has been established, "when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case and responds to plaintiff's proof by offering evidence . . . ." *U.S. Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Despite the fact that respondent has not moved for dismissal, this court will nevertheless analyze the merits in terms of determining first whether petitioner has established a prima facie case. Such an approach seems appropriate since, as the Supreme Court has noted in the context of an employment discrimination claim, prima facie case analysis is "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981). This court emphasizes that the decision to use the prima facie case mode of analysis has not caused it to lose sight of, or in any way depreciate the ultimate question of discrimination. Thus although the court employs a prima facie case mode of analysis, I nonetheless examine all available evidence.

### B. The Elements of a Jury Discrimination Claim

An intent to discriminate is a "necessary component" of a racial discrimination claim brought under the Equal Protection Clause of the Fourteenth Amendment. *Rose v. Mitchell,* 443 U.S. at 590, 99 S.Ct. at 3017 (White, J., dissenting); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

▌ Because discrimination is rarely openly confessed "[d]etermining whether invidious discriminatory purpose was a motivating factor [in a decision] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. at 266, 97 S.Ct. at 563. In the context of a discriminatory jury selection claim, a court should "look at all the facts that bear on the issue, such as the statistical disparities, the method of selection, and any other relevant testimony as to the manner in which the selection process was implemented." *Castaneda v. Partida,* 430 U.S. 482, 500–01, 97 S.Ct. 1272, 1283, 51 L.Ed.2d 498 (1977); *see also Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (stating that the Court "has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors").

The Ninth Circuit has recently observed that "[t]he elements of proof necessary to establish a prima facie case of intentional racial discrimination in the juror selection process turn of necessity on the circumstances of each case," *Hirst v. Gertzen,* 676 F.2d 1252, 1258 (9th Cir.1982). Nonetheless, the starting point for determining the sufficiency of petitioner's proof is the test spelled out in *Castaneda v. Partida:*

> The first step is to establish that the group is a recognizable, distinct class, singled out for different treatment under the laws.... Next, the degree of under-representation must be proved, by comparing the proportion of the group called to serve as grand jurors to the proportion in the total population, over a significant period of time.... This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection.... Finally, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280. (citations and footnote omitted).

Obviously for discrimination claims, both as a matter of law and history, blacks are a distinct class. *See, e.g., Keyes v. School District # 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). As I shall explain in detail *infra,* (*See* § IV D), the Kings County grand jury selection procedure was susceptible to abuse as applied. *See Castaneda v. Partida,* 430 U.S. at 497, 97 S.Ct. at 1281. Because I find these two criteria established I turn to the third element, the degree of underrepresentation, and petitioner's statistical showing.

### C. The Statistical Showing

▌ Under the "rule of exclusion ... [i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Id.* at 494 n. 13, 97 S.Ct. at 1280 n. 13. Thus, a key question is whether, under the "rule of exclusion" discriminatory purpose can be inferred from the absence of blacks from the Kings County grand jury for almost 70 years when blacks constituted between 0.8% and 5% of the total county population.

I begin by comparing the proportion of blacks on the grand jury to their proportion in the total population even though blacks were completely absent from Kings County grand juries. While it is true that " 'nothing is as emphatic as zero,' " *Morgan v.*

*United States,* 696 F.2d 1239, 1241 (9th Cir. 1983), *quoting Guice v. Fortenberry,* 661 F.2d 496, 505 (5th Cir.1981) (en banc), the Supreme Court has nonetheless utilized "rule of exclusion" analysis even when blacks were totally excluded from grand jury service. *See Rose v. Mitchell,* 443 U.S. at 571 and 573, 99 S.Ct. at 3007 and 3008. Although such analysis may seem superfluous when no blacks have sat as grand jurors, the high court's procedure can be rationalized. The Court has taught that a statistical basis for proof of discrimination can succeed only if a disparity is so large that it is unlikely to be solely due to chance or accident. Such a determination in turn can only be determined by reference to the excluded group's proportion in the population. That is, it has been held that when proof is statistically based, a disparity is not due to chance or accident, and therefore, by reasonable inference, is due to discrimination, where the excluded group constitutes a "substantial segment" of the population. *Hernandez v. Texas,* 347 U.S. 475, 480, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954); *see also Patton v. Mississippi,* 332 U.S. 463, 469, 68 S.Ct. 184, 187, 92 L.Ed. 76 (1947) (strong showing of discrimination by proof of no representation from "large group" of Negroes); *Reece v. Georgia,* 350 U.S. 85, 88, 76 S.Ct. 167, 169, 100 L.Ed. 77 (1955) (discrimination shown by long history of all-white juries when county contained a "sizeable" Negro population). Exclusion alone is insufficient to make out a prima facie case; under the rule of exclusion, the disparity between the excluded group's proportion in the population and the group's proportion on the grand jury panels must be sufficiently large so that it may be concluded that the exclusion is not due solely to chance or accident. Accordingly, I turn to rule of exclusion analysis.

Traditionally, courts have performed rule of exclusion analysis by simply comparing relevant percentages. The disparities between the percentage of blacks on the Kings County Grand Jury (zero percent) and the percentage of blacks in the county (approximately five percent in the years 1956–1962) are smaller than those found in the cases in which the Supreme Court has found a sufficient statistical disparity to support a prima facie case.[10] *See, e.g., Norris v. Alabama,* 294 U.S. 587, 590, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) (7.2% of indicting county population black); *Pierre v. Louisiana,* 306 U.S. 354, 359, 59 S.Ct. 536, 539, 83 L.Ed. 757 (1939) (49% of population black); *Smith v. Texas,* 311 U.S. 128, 129, 61 S.Ct. 164, 164, 85 L.Ed. 84 (1940) (20% of population, 10% of poll tax payers black); *Hill v. Texas,* 316 U.S. 400, 402–03, 62 S.Ct. 1159, 1160–61, 86 L.Ed. 1559 (1942) (15% of total population, 14% of poll tax payers black); *Patton v. Mississippi,* 332 U.S. 463, 465, 68 S.Ct. 184, 185, 92 L.Ed. 76 (1947) (36% of total adult population black); *Hernandez v. Texas,* 347 U.S. 475, 480–81, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) (14% of total population, 11% of those over 21, 7% of freeholders with Mexican or Latin American surnames); *Reece v. Georgia,* 350 U.S. 85, 87–88, 76 S.Ct. 167, 169, 100 L.Ed. 77 (1955) (10% of total and adult population black).[11]

10. While the Supreme Court has "never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks ...." *Alexander v. Louisiana,* 405 U.S. at 630, 92 S.Ct. at 1225, the Court has compared the evidence before it, including disparity figures, with that presented in previous cases. *See Castaneda v. Partida,* 430 U.S. at 495–96, 97 S.Ct. at 1280–81; *Rose v. Mitchell,* 443 U.S. at 572–73, 99 S.Ct. at 3008.

11. These percentages are either mentioned in the decisions, or have been calculated by this court from population figures reported in the decisions and relied upon by the court to find a prima facie case. All cited decisions, with the exception of *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84, in which a very small number of blacks had served on the grand jury, are total exclusion cases. Thus, the percentage a group constitutes in a population also represents the disparity between the group's proportion in the population and their proportion on the grand jury. The Ninth Circuit in *Morgan v. United States,* 696 F.2d 1239, 1241 (9th Cir. 1983), stated that in *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, the Court found a prima facie case where no blacks had been called for jury service in at least twenty-four years, "while the population of blacks in the county of indictment was approximately five percent." By this court's calculation,

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), moreover, the Court suggested that purposeful racial discrimination is not "satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." *Id.* at 208–09, 85 S.Ct. at 829. While one may reasonably question the present vitality of this observation,[12] it has not been directly repudiated by the Court, and continues to be used by some federal courts to bar the finding of a prima facie case on a showing of a disparity of less than ten percent. *See, e.g., United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1126–27 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981). If a raw comparison of the disparity between a group's percentage in the population and the group's percentage among grand jurors is the only appropriate method of analysis, *Swain* may be perceived as precluding a finding of a prima facie case in the matter sub judice. *But see* n. 12.

Thus when considering petitioner's showing in terms of *Swain,* or in comparison with the showing made in cases reviewed by the Supreme Court, the case appears weak. Either method of consideration, of course, assumes that a straight comparison of the percentage of blacks in the population against the percentage of blacks on the grand jury is the appropriate method of analysis in this case.

Analysis of petitioner's claim, however, does not end with, and indeed does not even begin with, a raw comparison of disparity figures, nor is the test proposed subject to *Swain's* 10% de minimis figure. Rather, petitioner proposes that the court examine the relevant statistics in the light of a probability theory analysis. His abjuring of a simple comparison test seems wholly justified. As both courts and commentators have observed the use of mere disparity figures alone (*i.e.,* a straight comparison test) can produce misleading or even meaningless analysis in jury discrimination cases. This is especially true when, as here, the "recognizable distinct class" makes up a small percentage of a population. *See Hirst v. Gertzen,* 676 F.2d 1252, 1259 n. 14 (9th Cir.1982); *Foster v. Sparks,* 506 F.2d 805, 811, 835 (5th Cir.1975) (Appendix: An Analysis of Jury Selection Decisions, by Hon. Walter P. Gewin); *Smith v. Yeager,* 465 F.2d 272, 279 n. 18 (3d Cir.), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972); *Quadra v. Superior Court of City & County of San Francisco,* 403 F.Supp. 486, 495 n. 9 (N.D.Cal.1975); Sperlich & Jaspovice, *Methods For The Analysis of Jury Selections: Testing For Discrimination In A Series Of Panels,* 6 Hastings Const.L.Q. 787, 793–94 (Spring 1979). These authorities convincingly demonstrate that a simple comparison of disparity figures is of little value in deciding whether petitioner in this case has demonstrated a prima facie case. The uncertain meaning of disparity figures when a group makes up a small proportion of the population, together with the knowledge that no black had ever been called to serve on the Kings County Grand Jury,[13] led in the present case to the taking of evidence concerning statistical probability analysis. The receipt

blacks in fact constituted approximately 7.2% of the total population. Blacks also constituted approximately 7.5% of the male population over age 21, and thus of the right sex and old enough to serve as jurors.

**12.** Seven years after *Swain,* the Court in *Alexander v. Louisiana,* 405 U.S. at 630, 92 S.Ct. at 1225, noted that it had never announced mathematical standards for the demonstration of systematic exclusion, thus suggesting that *Swain* did not set 10% as an absolute de minimis standard. Indeed the Court has on at least two occasions found a prima facie case when the disparities, calculated by this court from the

population figures mentioned in the decisions, were in fact 10% or less. *See Norris v. Alabama,* 294 U.S. at 590–91, 55 S.Ct. at 580; *Reece v. Georgia,* 350 U.S. at 87–88, 76 S.Ct. at 169. Finally, the holding in *Swain* is undercut by the recognition that disparity figures can be misleading (*see* discussion *infra*).

**13.** As the Ninth Circuit recently stated, "[a]bsolute exclusion of blacks can violate equal protection even where the number of blacks in the population is small." *Morgan v. United States,* 696 F.2d 1239, 1241 (9th Cir. 1983).

of evidence concerning statistical probability analysis is hardly unusual in jury discrimination cases.

Consideration of evidence concerning statistical probability analysis in jury discrimination cases has been specifically endorsed by the Supreme Court. *See Castaneda v. Partida,* 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Rose v. Mitchell,* 443 U.S. 545, 571–72, 99 S.Ct. 2993, 3007–08, 61 L.Ed.2d 739 (1979). The Ninth Circuit has held that the statistical analysis method employed in *Castaneda* would be "an appropriate method" of determining the significance of a disparity in a jury discrimination case involving a group that constituted a small percentage of the population. *Hirst v. Gertzen,* 676 F.2d at 1258 n. 14. Other courts have also found probability analysis to be the best method for evaluating raw jury selection figures. *See, e.g., Villafane v. Manson,* 504 F.Supp. 78 (D.Conn.1980). Indeed the Fourth Circuit has gone so far as to reject comparisons of straight disparity figures as a method of analysis in jury discrimination cases, requiring instead the use of probability analysis. *See Moultrie v. Martin,* 690 F.2d 1078, 1082 (4th Cir.1982). Moreover, commentators have consistently called for the use of some kind of statistical test for analyzing discrimination claims.[14]

Statistical probability analysis, as this court stated in an earlier Opinion and Order, is simply another way of interpreting the data already before the court. *See Hillery v. Pulley,* 533 F.Supp. 1189, 1203 (E.D.Cal.1982).[15] In terms of the "rule of exclusion," statistical analysis has the potential of indicating that a given disparity is unlikely to be due to chance or accident, even when that conclusion could not be drawn from the disparity figures alone.

Moreover, statistical analysis reduces the scope of intuition involved in comparing disparities. As the Fourth Circuit has said, "[s]tatisticians do not simply look at two statistics, such as the actual and expected percentage of blacks on a grand jury, and make a subjective conclusion that the statistics are significantly different. Rather, statisticians compare figures through an objective process . . . ." *Moultrie v. Martin,* 690 F.2d at 1082. While this court does not fully embrace the Fourth Circuit's unalloyed enthusiasm since, in the final analysis the evaluation of all evidence is dependent on the trier of facts' evaluation of credibility, both the Federal Rules of Evidence and good sense suggest the propriety of employing expert opinion to aid in resolution of questions within the field of contemporary statistical analysis. Fed.R.Evid. 702.

Petitioner presented the testimony and report of an actuary, Donald Parkyn. This witness, through the application of a form of probability analysis, concluded that if the grand juries selected in Kings County between 1900 and 1962 had been chosen by chance, the probability that all would be non-black would be exceedingly small—57 out of one hundred thousand million. *See* Petitioner's Exhibit No. 6. Similarly, he testified that the probability that random selection would produce all non-black grand juries for the years 1900 to 1930 was less than one percent, *id.,* and that the probability was approximately two-tenths of one percent that random selection would produce non-black grand juries for the years 1956 to 1962. *See* Petitioner's Exhibit No. 8. These conclusions support a finding that the absence of blacks from the Kings County Grand Jury was unlikely to be due solely to chance or accident. Under the "rule of exclusion," Mr. Parkyn's findings, if accept-

---

**14.** *See* Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases,* 80 Harv.L.Rev. 338 (1966); Sperlich & Jaspovice, *Statistical Decision Theory and the Selection of Grand Jurors: Testing for Discrimination in a Single Panel,* 2 Hastings Const.L.Q. 75 (1975); Kairys, *Jury Representativeness: A Mandate for Multiple Source Lists,* 65 Cal.L. Rev. 776 (1977); Sperlich & Jaspovice, *Methods For The Analysis of Jury Selections: Test-* *ing For Discrimination In A Series of Panels,* 6 Hastings Const.L.Q. 787 (1979).

**15.** The court reaffirms its earlier analysis of this issue in that case as it relates to the State's argument concerning exhaustion of state remedies. Therefore, the State's renewed exhaustion argument, presented in its Final Argument at p. 5, is rejected.

ed, would tend to establish an inference of intentional discrimination.

The State did not call a statistical expert at the evidentiary hearing.[16] Nor did the State rebut the conclusions of petitioner's expert through other evidence, cross-examination, or argument.[17] This failure on the part of the State leaves this court in the most difficult position of having to evaluate the evidence offered by petitioner's expert without the benefit of a second expert's opinion. Of course, I could simply accept Mr. Parkyn's conclusions. Although such acceptance would be wholly justified given the State's lack of response, this court cannot fully do so here since, as I explain below, I harbor some doubt as to some of the conclusions reached by Mr. Parkyn. Nonetheless the court frankly admits that due to the State's evidentiary failure, the following evaluation is based on my own layperson's understanding of statistics and probability analysis and not on any showing made by the State. Accordingly, the court readily acknowledges it may be faulty.

Petitioner's expert's conclusions with regard to the probability that some or all of the grand juries in Kings County would not include any blacks had they been randomly selected were obtained in a rather direct manner. After obtaining the probabilities of such a jury for each year he merely multiplied the probability of a grand jury without blacks being formed through random selection in a particular year by the

probability for each of the other years in question. For example, the 57 out of 100,-000 million figure, representing the probability that random selection would produce grand juries without blacks from 1900 to 1962, was obtained by multiplying the probability that random selection would produce a grand jury without blacks in 1900 by the equivalent probabilities for *each* of the next 62 years.

From a layperson's perspective, this method rests on a suppressed predicate which may not be fully supported by the evidence. To multiply each year against the next year assumes that both the same selector and the same selection process was always at work. That is, the method assumes a single series or set is being considered. Yet to this layperson such an assumption seems unwarranted under the facts in this case, since it was established that the position of the superior court judge had been occupied by persons other than Judge Wingrove during that period. I shall attempt to explain my concern with a homey illustration.

Let us suppose that a card dealer may obtain an advantage over his fellows by being the only card player who knows that although the deck contained an 8 of diamonds to begin with, it has been palmed and thus is no longer in the deck. Let us further assume that the game is played in such a way that only the dealer can remove a card without it being noticed. At some

---

**16.** Respondent's failure to present expert statistical analysis is baffling. Earlier in this proceedings, respondent stated in an answer to an interrogatory that a statistical expert was in the process of being retained. *See* Respondent's Answers to Petitioner's Interrogatories, May 8, 1981, p. 4. Thereafter, respondent's counsel, in a sworn affidavit attached to a motion to dismiss, stated that an expert had: (1) been retained; (2) made a preliminary review of Mr. Parkyn's report; (3) indicated there appeared to be substantial deficiencies in the report; and (4) would be available to testify at an *evidentiary hearing. See* Exhibit C, Declaration of Wm. George Prahl, attached to Response to The Court Order of September 29, 1981, and Notice of Motion And Motion To Dismiss The Petition, October 30, 1981. Finally, at the evidentiary hearing, respondent's counsel attempted to call petitioner's expert as

his own witness. The court notes that the only thing more disturbing than the State's failure to introduce expert statistical analysis was respondent's counsel's pointless honing of his cross-examination skills on the elderly black citizens of Kings County whom petitioner had called as witnesses on the question of availability of blacks to serve as jurors and other historical questions.

**17.** The State's 36 page Closing Argument contains only 6 paragraphs concerning statistical probability analysis. *See* Respondent's Closing Argument at 18–19. The two paragraphs that deal with the method used and conclusions reached by petitioner's expert are too general and confused to be of any real value. *Id.* at 19:2–15. The State's more general objections to the statistical evidence are dealt with *infra.*

point the question is raised as to whether there is still an 8 of diamonds in the deck of cards. The question is tested by dealing out 10 of the 52 cards and no 8 of diamonds is produced. This procedure permits a calculation of the probability that an 8 of diamonds is absent based on the probabilities that an 8 of diamonds would not be dealt when 10 cards are dealt from a pack of 52 cards. Reshuffling and repeating the experiment with the same deck produces a further statistical probability and multiplying the two tells us the probabilities of no 8 of diamonds appearing twice. At some point repeated efforts with the same deck and with the same result leads to the statistical probability that there is no 8 of diamonds in the deck. Since there was only one dealer in the course of the game, it is reasonable to infer on that basis that the dealer palmed it. If, however, during the course of the game in question, a different dealer was substituted now and again, the probability that the final dealer palmed the card cannot be calculated from the fact that it is probable that there is no 8 of diamonds in the deck. The latter conclusion seems proper because in the latter circumstance we have a discontinuous series; multiplying the results, however, treats them as a single series. On the other hand, if the new dealer brings with him a new deck of cards in which it is known that there is an 8 of diamonds, it is not inappropriate to calculate the probabilities based on the series of tests relating to the last dealer only. In a sense, the reliability of Mr. Parkyn's testimony concerning the probabilities of an all non-black jury between 1900 and 1956 in the instant case is dependent upon whether

we are dealing with a continuous or discontinuous series. It appears to this court that the question of whether such a factual predicate existed was not properly resolved at either the superior court hearing or this court's evidentiary hearing.[18]

Because of the above analysis, the court is unable to completely accept the expert's conclusion as to probability analysis from 1900 onward. (*But see* n. 18) The court does, however, accept the results obtained by Mr. Parkyn for the period 1956–1962. It appears to the court that for this period we deal with a single set and thus the expert's method is proper. During that period the evidence shows that the jury was selected by the same selector using a single selection process. Although the body of "cards" may shift from year to year, each shift in population is measured against the *relative* number of blacks in the population as a whole. Under these circumstances, this trier of fact is satisfied that a single series is in question and the results of the calculations sufficiently accurate to be reliable.[19]

Although the State does not do so, the expert's conclusions might also be attacked on the basis that they were obtained by use of a statistical method different from the standard deviation analysis endorsed by the Supreme Court in both *Castaneda v. Partida,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17, and *Rose v. Mitchell,* 443 U.S. at 571–72, 99 S.Ct. at 3008–09, as well as that endorsed by the Ninth Circuit in *Hirst v. Gertzen,* 676 F.2d at 1258 n. 14. Neither *Castaneda, Rose,* nor *Hirst,* however, suggests that standard deviation analysis is the exclusive method of evaluating statistics in jury se-

**18.** Certainly, if there is a new deck each time a dealer changes, the probabilities of the last dealer being a culprit seem strong. Moreover, if the experiment is conducted after each change of dealers and the probabilities after each such experiment is that there is no 8 of diamonds in the deck, we have powerful evidence concerning the house's policy on cheating. The problem here, however, is that it appears to me that to some degree the very small percentage of blacks in the early years has been given undue weight by virtue of multiplication of those probabilities against those of later years where there were a greater number

of blacks in Kings County and thus where the probabilities appear to be more significant. It may well be that probability theory addresses all these questions—unfortunately, the State put on no evidence and the court is left to its own inadequate devices.

**19.** The court wishes to be clear about the factual determination made here. It is made, as all factual determinations must be made, by bringing to bear the trier of fact's intellect on the evidence adduced at trial. A different record, more fully exploring probability theory, might produce a different result.

lection cases. The question here is, as it must be, not whether the particular analytical system is "approved" but whether it is sufficiently reliable so that the trier of fact may rely on the testimony based on it. The sole evidence before the court on this issue is petitioner's expert's testimony that the method he employed is wholly appropriate. The State offered no evidence that Mr. Parkyn's method is inappropriate or that his results are tainted. In the absence of such evidence, this court accepts Mr. Parkyn's method and conclusions to the extent indicated above. Moreover, as I shall now demonstrate, use of the *Castaneda* method apparently also supports a finding that petitioner has proven a prima facie case (or viewed in terms of *U.S. Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), has produced persuasive circumstantial evidence on the ultimate issues).

The Supreme Court has suggested that if the record contains the necessary data, a court should perform the calculations involved in a standard deviation analysis and determine if the results are significant under the "rule of exclusion." *See Rose v. Mitchell,* 443 U.S. at 571–72, 99 S.Ct. at 3007–08. I now turn to that task for the period 1956–1972. In doing so, this court is guided by the Supreme Court's lengthy and detailed explanation of the method found at footnote 17 in *Castaneda.*

The Supreme Court has taught that "[a]s a general rule . . . *if a difference between* the *expected value* and the *observed number* is greater than *two or three standard deviations,* then the hypothesis that the jury drawing was random would be suspect

to a social scientist." *Castaneda v. Partida,* 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17 (emphasis added). Judge Wingrove selected a panel of thirty (30) potential grand jurors annually, meaning that in the seven (7) years between 1956 and 1962 he selected two hundred ten (210) potential grand jurors. During these seven years, blacks on the average comprised approximately 4.6% of the Kings County population over age 21.[20] Given these figures, the expected number of blacks among the 210 grand jurors would be 4.6% of 210, or approximately ten (10).[21] The observed number of blacks, of course, is zero.

In terms of the "rule of exclusion," the critical question is whether the difference between the expected result (10) and the observed number (0) is greater than two or three standard deviations. The standard deviation here is approximately three (3).[22] Thus, the difference between the expected value (10) and the observed number (0) is just over three standard deviations.[23] Although this difference is not as large as the difference of 29 or 12 standard deviations noted for the relevant periods in *Casteneda,* 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17, it does suggest that the absence of blacks from the Kings County Grand Jury panels from 1956–1962 was unlikely to be due solely to chance or accident.

The Ninth Circuit has observed "that courts should be 'extremely cautious' of drawing any inferences from standard deviations in the range of 1 to 3." *Gay v. Waiters' & Dairy Lunchmen's Union,* 694 F.2d 531, 551 (9th Cir.1982), *quoting EEOC v. American National Bank,* 652 F.2d 1176, 1192 (4th Cir.1981).[24] In the present case

---

**20.** This figure was obtained by averaging the percentage figures submitted by petitioner, and accepted by the court, for each of the years between 1956 and 1962. *See* Petitioner's Exhibit 6.

**21.** 4.6% of 210 is exactly 9.66. This figure was rounded off to ten (10).

**22.** The standard deviation is the square root of the product of the total number in the sample (here 210) times the probability of selecting a black (.046, correlating to their percentage in the population) times the probability of select-

ing a non-black (.954). *See Castaneda v. Partida,* 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17. The exact result here is 3.03.

**23.** The difference is just over three standard deviations whether one uses the approximate figures in the text or the exact figures stated in footnotes 21 and 22.

**24.** In *Gay,* 694 F.2d 531, the court affirmed the district court's findings that the differences of 2.46 and 1.30 standard deviations were insufficient by themselves to establish a prima facie case of intentional discrimination. *Id.* at 552.

there is a difference of just over 3 standard deviations, and this court notes that the difference would undoubtedly be larger if the years prior to 1956 were factored into the calculations.[25] For these reasons this court, even after exercising caution, finds that standard deviation analysis supports Mr. Parkyn's conclusions and, under the "rule of exclusion," indicates that "racial or other class-related factors entered into the selection process." *Castaneda v. Partida,* 430 U.S. at 494 n. 13, 97 S.Ct. at 1280 n. 13.

Although the State has not raised any meaningful challenge to plaintiff's analysis of the statistics, it does object to the statistical evidence on the general grounds that petitioner did not introduce or use population figures based on those eligible to serve as grand jurors. Moreover, it argues that the conclusions are insufficient to raise a prima facie case since it argues that disproportionate impact alone is insufficient to prove discriminatory purpose and the statistics prove only disproportionate impact. Both of these objections are without merit.

Although a dissent in *Castaneda* argued that eligible population figures should be required for determining a prima facie case (*see* 430 U.S. at 504–07, 97 S.Ct. at 1285–86, Burger, C.J., dissenting), the majority at least implicitly rejected the argument. *Id.* at 486–89 n. 6–8, 97 S.Ct. at 1275–77 n. 6–8. Moreover, the population figures presented in this case are not in fact as over-inclusive as the State's argument would seem to suggest. The figures used here are not based on total population data, but on the Kings County population over age 21, and thus at least old enough (and arguably presumptively eligible for) grand jury service. *See Alexander v. Louisiana,* 405 U.S. 625, 627, 92 S.Ct. 1221, 1223, 31 L.Ed.2d 536 (1972).

While the Supreme Court has not required the use of eligible population figures, it has indicated that a prima facie statistical showing under the "rule of exclusion" is buttressed by evidence from which one can infer that among the excluded group there were people eligible for jury service. *See, e.g., Norris v. Alabama,* 294 U.S. 587, 591, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) (direct testimony established that specified blacks, thirty or more in number, were qualified for jury service); *Pierre v. Louisiana,* 306 U.S. 354, 360, 59 S.Ct. 536, 539, 83 L.Ed. 757 (1939) (using census figures concerning level of education to infer literacy, a requirement for jury service); *Hill v. Texas,* 316 U.S. 400, 403–04, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942) (also using census figures to infer literacy); *Hernandez v. Texas,* 347 U.S. 475, 481, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) (parties stipulated there were some persons of Mexican or Latin American descent eligible for jury service). In the present case, no census data or other statistics were introduced (other than the percentage of blacks over age 21) from which one could infer that blacks in Kings County possessed certain of the attributes required for jury service.[26] It is undisputed, however, that during the period in question, blacks had served on Kings County trial juries. Since the requirements for trial jurors were essentially the same as those for grand jurors, there is ample evidence

---

25. It is not clear to the court that the same problem of discontinuous series would apply to an examination of the figures for the entire period of 1900 to 1956 where the question is whether there is a pattern of historic discriminatory selection which supports a notion that the county's method of selection is suspect, as contrasted with the question of whether a selector was himself motivated by a prohibited discriminatory intent. Moreover, cases in the past employing standard deviation analysis have not been reluctant to use historical figures as if they were a single, rather than discontinuous, series even when the period considered was extremely lengthy and the "selectors" changed.

26. The Supreme Court in *Castaneda v. Partida,* explicitly recognized that there are several problems with using census data concerning levels of education to reach valid conclusions as to literacy. "[I]t is difficult to draw valid inferences from the raw census data, since the data are incomplete in some places and the definition of 'literacy' would undoubtedly be the subject of some dispute in any event.... One gap in the data occurs with respect to the younger persons in the jury pool. The census reports for educational background cover only those who are 25 years of age and above." *Castaneda v. Partida,* 430 U.S. 482, 488 n. 8, 97 S.Ct. 1272, 1276 n. 8, 51 L.Ed.2d 498 (1977).

that there were blacks eligible to serve as grand jurors. Moreover, this court has found from other credible testimony over and above the evidence concerning service of blacks as trial jurors that there existed in Kings County a number of blacks who met the qualifications for grand jury service (*see* Statement of Facts).

The State also argues, almost as an aside, *see* Closing Argument at 19:20–23, that the Supreme Court's observation in *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), that "an official act is not unconstitutional solely because it has a racially disproportionate impact" renders petitioner's statistical showing totally meaningless since statistical evidence inherently can only demonstrate disparate impact. This argument is patently frivolous. The Supreme Court has explicitly held that the impact of official action "may provide an important starting point" for resolving the issue of whether a prohibited discriminatory purpose was present." *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The Court has also observed that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of state action . . .'," thus making the evidentiary inquiry into the question of discriminatory purpose "relatively easy." *Id.* The Court has recognized that jury selection cases fall into the category of cases susceptible to such observation, and that, because of the nature of a jury selection process, the statistical pattern need not be conclusive. *Id.* at 266 n. 13, 97 S.Ct. at 563 n. 13. I conclude that statistical evidence can, and in this case does, provide a basis for an inference of discriminatory intent. Moreover, statistical evidence is not the sole fact being considered by this court. It is but one fact among a totality of circumstances, including the method of selection of grand jurors. I now turn to an examination of the non-statistical evidence.

### D. *The Non-Statistical Evidence*

Consideration of such non-statistical evidence of intentional discrimination as exists is, of course, proper and indeed is required. *See Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. at 266, 97 S.Ct. at 563. Consideration of such evidence is especially appropriate in a case raising a jury discrimination claim because, as the Supreme Court has held, no matter what the statistical showing under the rule of exclusion, "a prima facie case of discriminatory purpose may be proved . . . by the absence of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in the community . . . or with racially non-neutral selection procedures . . . ." *Washington v. Davis,* 426 U.S. at 241, 96 S.Ct. at 2048 (citations omitted).

Petitioner argues that the statements made by Judge Wingrove at the pretrial hearing concerning his selection of grand jurors evidence intentional discrimination. According to petitioner, the judge's statements that he desired the "better type" of person for grand jury service and had not chosen a black because he could not find one that would make a "proper" juror clearly show racial prejudice. The question here, then, is whether the judge's statements evidence intentional discrimination in the selection of grand jurors and thus buttress petitioner's statistical case.

In a world in which racial prejudice has frequently been masked by the use of code words, any reasonable trier of fact might well find the juror selector's explanation of the kind of grand juror he sought highly suspect. Nonetheless, Judge Wingrove's gloss on California's statutory qualifications for grand jury service was not in itself necessarily prejudicial. Indeed, the criteria articulated were "capable of being [applied] with no racial discrimination whatsoever." *Smith v. Texas,* 311 U.S. 128, 130–31, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1941). Thus it cannot be said that Judge Wingrove's desire for the "better type" of citizen resulted in an explicitly racist selection procedure of the kind (for instance) condemned in *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (colored tickets indicated racial background of potential jurors), or

*Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (segregated tax digests used as source lists). Juror selection systems not inherently unfair, or not necessarily incapable of administration without regard to race, when attacked, have often been held constitutional. *See, e.g., Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) (scheme requiring selection of those "generally reputed to be honest and intelligent and ... esteemed in the community for their integrity, good character, and sound judgment..." valid); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970).

Nonetheless, in the instant case it is clear that the result of the judge's selection of only those whom he considered the "better type" was the complete absence of blacks from the grand jury. Judge Wingrove himself said the reason no blacks had been selected was that he had been unable to find any he felt would be a "proper" grand juror. That blacks were absent from the grand juries selected by Judge Wingrove, or that the judge acknowledged that no blacks were selected because he could not find any that would make a proper juror, while clearly some evidence, again does not necessarily prove discriminatory intent. Indeed the Supreme Court has explicitly held that:

> 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. *It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.*

*Personnel Administrator Of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted and emphasis added). To paraphrase *Feeney,* there is no direct evidence that Judge Wingrove selected only the "better type"

*because* the use of such criteria would keep blacks off the grand jury.

The Supreme Court, while rejecting in *Feeney* the contention that the foreseeable adverse impact of a neutral action on a particular race is necessarily prima facie evidence of intentional discrimination, nonetheless has recognized that a court may properly consider whether an official or individual has adhered to a particular practice with full knowledge of its foreseeable effects upon the affected group. *See Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1975); *see also Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 555 (9th Cir.1982). In the present case, it is clear that Judge Wingrove continued to select the "better type" of person with full knowledge that such action would result in no blacks serving on the grand jury panels. This circumstantial evidence supports petitioner's claim since, as a matter of "distilled common sense and experience," *United States v. Jenkins,* 567 F.2d 896, 897 (9th Cir.1978) (per curiam), it is reasonable to infer that a person intends the natural consequences of his acts. *See Cramer v. United States,* 325 U.S. 1, 31, 65 S.Ct. 918, 933, 89 L.Ed. 1441 (1945); *United States v. Ross,* 626 F.2d 77, 79–80 (9th Cir.1980); 1 Devitt & Blackmar, *Federal Jury Practice and Instructions,* § 14.13 (1977).[27] In the present case, the fact that Judge Wingrove continued to select only the "better type" of person, with full knowledge that such action would mean that no blacks would serve, further supports the prima facie showing of intentional discrimination.

Judge Wingrove's statements, moreover, do highlight an important element of proof in petitioner's prima facie case—the highly subjective nature of the grand jury selection system. Subjectivity is inherent in any system where, as here, the selection of potential grand jurors is left to a single per-

---

**27.** As the cited authorities indicate, the principle that a trier of fact may infer that a person intends the natural consequences of his acts is a well-established principle of criminal law, and has its analogs in other legal disciplines. *See, e.g.,* W. Prosser, *Law of Torts,* § 8 (4th ed.

1971). Of course it does not follow that the trier of fact *must* infer that a person intended the consequences of his or her actions and to so instruct raises constitutional questions in a criminal context. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

son whose discretion is guided, if at all, by the most imprecise standards. The Supreme Court has consistently held that the existence of a subjective selection system supports a prima facie showing of discriminatory purpose made out by use of statistics. *See, e.g., Castaneda v. Partida,* 430 U.S. at 497, 97 S.Ct. at 1281; *Turner v. Fouche,* 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 532 (1970). That is, a subjective selection system is evidence which, together with other evidence, may suffice to demonstrate a prima facie case. In *Turner,* the Court remanded the action where the evidence demonstrated a statistically significant disparity coupled with evidence suggesting the disparity was caused in part by the high percentage of blacks that had been eliminated from jury service on the grounds they were unintelligent or not upright. *Id.* at 359–60, 90 S.Ct. at 539–40. *Turner* illustrates the danger of a subjective selection system. The standards employed in the present case are comparable. Blacks were not selected by Judge Wingrove because he wanted the "better type" of person and could not find a black who would make a "proper" grand juror. Intelligence, moral "uprightness," "better types," and "proper" jurors provide no standards at all, but inevitably are merely the subjective judgment of the selector. When that selector is a single person who need not justify his or her conclusions, the system of selection is wholly subjective. When such a system is coupled with a statistically significant deviation from the expected result, significant evidence of discrimination has been adduced. Here, as in *Turner,* the prima facie case made by petitioner's statistical showing is supported by the fact that in Kings County, a subjective selection system was used to choose potential grand jurors.[28]

Other circumstantial evidence also supports plaintiff's case. The Ninth Circuit, in an employment discrimination claim context, has recognized the propriety of considering "especially dramatic increases in minority hiring as circumstantial evidence of prior intentional discrimination." *Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 555 (9th Cir.1982), *citing Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (9th Cir.1975). This kind of evidence is equally appropriate in a discriminatory jury selection case. The historical context in which petitioner's claim arose demonstrated a long continued absence of blacks from the grand jury panels. An expert's conclusion is that probability analysis simply precludes the result as a matter of chance. Yet the year after petitioner raised the issue of systematic exclusion in his pretrial motion to quash the indictment, a black was selected by Judge Wingrove as a potential grand juror and ultimately was chosen for the grand jury. Other blacks served as grand jurors in subsequent years. What is "especially dramatic" is a matter of subjective perception. In this court's view, the evidence tendered, whether especially dramatic or not, is further circumstantial evidence of prior discriminatory intent, and thus supports petitioner's statistical showing. This is especially so considering that the percentage of blacks in Kings County did not increase in the years following petitioner's indictment. Indeed, the 1970 census report-

---

**28.** The jury selector has a "constitutional duty ... not to pursue a course of conduct in the administration of [his] office which would operate to discriminate in the selection of jurors on racial grounds." *Hill v. Texas,* 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942). Specifically, he was obligated to "familiarize [himself] fairly with the qualifications of the eligible jurors of the county without regard to race or color ...." *Cassell v. Texas,* 339 U.S. 282, 289, 70 S.Ct. 629, 632, 94 L.Ed. 839 (1950); *see also Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). As the Court stated, "[d]iscrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are any qualified to serve." *Hill v. Texas,* 316 U.S. at 404, 62 S.Ct. at 1161. Because the evidence as to Judge Wingrove's efforts in fulfilling this duty is somewhat equivocal the court does not rest its decision on the grounds that the duty was violated. Nonetheless, given the most generous reading of the judge's description of his efforts to fulfill his duty under *Hill, Cassell,* and *Smith,* it did not amount to much. To the degree that these minimal efforts affect the decision in this case, they appear to be further circumstantial evidence supporting the prima facie case.

ed that the percentage of blacks over age 21 in Kings County was lower than the percentage calculated for 1960.

### E. Conclusions as to Petitioner's Showing

The court believes it has engaged in the requisite sensitive inquiry into all of the circumstances bearing on the question of whether a discriminatory purpose was at work in the selection of the Kings County grand jury panels in general and the one which indicted petitioner in particular. I find that the statistical showing made by petitioner, as supported by the standard deviation analysis done by this court, together with the facts that potential grand jurors were chosen by means of a subjective system, that there were blacks eligible for grand jury service, that the selector continued to use criteria to select jurors knowing that blacks would be excluded, and that blacks were chosen after petitioner raised the issue, make out a prima facie case of intentional discrimination.

■ Once a prima facie showing is made out, "the burden of proof [shifts] to the State to dispel the inference of intentional discrimination." *Castaneda v. Partida*, 430 U.S. at 497–98, 97 S.Ct. at 1281–82. In

other words, "it becomes the duty of the State to justify such an exclusion [or substantial underrepresentation] as having been brought about for some reason other than racial discrimination." *Patton v. Mississippi*, 332 U.S. 463, 466, 68 S.Ct. 184, 186, 92 L.Ed. 76 (1947). As a practical matter, any lawful justification or explanation for the exclusion or underrepresentation would be peculiarly within the knowledge of the state officials charged with the duty of making the jury selections. For this reason, "[i]f there is a 'vacuum' it is one which the State must fill ...." *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953).[29]

## V

### STATE'S REBUTTAL

■ The State has responded to petitioner's claim in several ways. It argues for various reasons the court should not decide the merits of the claim. These arguments have been answered either earlier in this order or in earlier orders. It also argues that petitioner has not proven a prima facie case. *See* Closing Argument at pp. 16–20. The State's arguments in this regard may be irrelevant (*see* n. 29) but in any event have been thoroughly discussed supra.

29. It is unclear whether the shift of the burden in question is one of producing evidence or of persuasion, *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In various cases the Supreme Court has taught that a prima facie case raises a "presumption" of discrimination. *See Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1225–26, 31 L.Ed.2d 536 (1972); *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3004, 61 L.Ed.2d 739 (1979). A presumption of course usually refers to a device for allocating the production burden. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254 n. 8, 101 S.Ct. at 1094 n. 8. On the other hand, the court has also observed that a prima facie case raises an inference of discrimination. *Castaneda v. Partida*, 430 U.S 482, 497–98, 97 S.Ct. 1272, 1281–82, 51 L.Ed.2d 498 (1977); *see also Hirst v. Gertzen*, 676 F.2d 1252, 1260–61 (9th Cir.1982) (characterizing the district court's determination of the existence of a prima facie case as factual, reviewable under the clearly erroneous standard). An inference is, of course, a deduction of one fact from a proven fact by the ordinary rules of

logic and reasoning. J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 300[01] at 300–2 (1982). Where we deal with a factual finding, in the absence of persuasive evidence the prima facie case will suffice to prevail. Where we deal with a production burden, however, when the State produces evidence the presumption disappears and the court must weigh all the evidence adduced with the petitioner bearing the burden of persuasion. In any event as noted in the text, this court is considering the factual issue after trial. Accordingly, although using prima facie case analysis helps sharpen the issues, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094, it becomes this court's responsibility to consider all the evidence and resolve the underlying issues. *U.S. Postal Service Board of Governors v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Whichever burden is at stake, the State has failed to carry it. The State produced no additional evidence at the hearing, instead relying upon the findings made at the pretrial hearing. As I discuss in the text, such evidence is unpersuasive in light of petitioner's showing.

Although the State adduced no new evidence at this court's evidentiary hearing, it argues that there are several facts in the record which negate or rebut any prima facie showing of purposeful discrimination. *See* Closing Argument at 20–22. That is to say, it argues that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). More simply, it argues that there is evidence to "justify [the] exclusion as having been brought about for some reason other than racial discrimination." *Patton v. Mississippi,* 332 U.S. 463, 466, 68 S.Ct. 184, 186, 92 L.Ed. 76 (1947). I turn to an examination of the proffered evidence.

The State argues that Judge Wingrove's statements that he did not discriminate against blacks and that he tried to select a true cross-section should be given some weight. Even overlooking the non-testimonial character of the statements (*see* n. 2), the Supreme Court has squarely held "that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander v. Louisiana,* 405 U.S. at 632, 92 S.Ct. at 1226 *citing Turner v. Fouche,* 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 532 (1970); *Jones v. Georgia,* 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967); *Sims v. Georgia,* 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967). "The result bespeaks discrimination, whether or not it was a conscious decision on the part of the jury commissioner." *Hernandez v. Texas,* 347 U.S. 475, 482, 74 S.Ct. 667, 672, 98 L.Ed. 866 (1954). Put another way, given all the evidence adduced during the two hearings in this matter, the court is unable to credit the "testimony."

The State also points to the testimony of the county clerk to the effect that the judge never asked her to determine a potential juror's race when she was given their names by the judge to check for occupational and other exemptions. This testimony simply does not rebut petitioner's showing. Indeed, the clerk's testimony is irrelevant since the selection of potential jurors occurred before the clerk checked the names. Judge Wingrove's protestation that he had tried and failed to find any suitable blacks demonstrates what is self evident, when the list arrived at the county clerk's desk it was composed only of whites.

The State argues that it is significant that blacks had served on Kings County trial juries. It argues that this fact distinguishes the present case from two Supreme Court decisions in which blacks had been excluded from both grand and petit juries. The suggestion on the State's part, if such it be, that to prevail petitioner must prove systematic exclusion of blacks from both grand and petit juries is unsupported by any case law. To the degree that respondent seeks to demonstrate that, by virtue of the fact that blacks were selected for trial jury panels, evidence has been adduced that Judge Wingrove did not discriminate, the record does not support the contention. The county supervisors, not the judge of the superior court, were responsible for selecting the trial jury panels.

The State also seeks to rely on the fact that the Kings County Grand Jury did not regularly perform an indicting function but instead was primarily a watchdog on county government. This fact was also mentioned by Judge Wingrove at the pretrial hearing and by the California Supreme Court in its decision affirming Judge Wingrove's ruling and petitioner's conviction. Neither Judge Wingrove, the Supreme Court, nor the State in this proceeding has explained why this fact is at all relevant to the issue at hand and this court simply can find no relevance. If the State is arguing that the limited indictment function of the Kings County Grand Jury insulated or immunized it from the requirements of the Equal Protection Clause, the argument must be rejected. It is well-settled that if a state chooses to have a grand jury, it must ensure that selection practices do not violate federal constitutional guarantees. *See Carter v. Jury Commission of Greene County,* 396 U.S. 320, 330, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970).

Finally, the State asserts in the factual portion of its argument that "grand jury service would have been a significant economic hardship for the county's black population which was largely engaged in itinerant farmwork." The State continues, "[t]here were also residence requirements which provided some lead time before the postwar influx of blacks would have been eligible for grand jury service." State's Closing Argument at 21. The relevance of this argument as a rebuttal to petitioner's showing is not explained by the State and again is not immediately apparent to the court. Perhaps this is an attempt to frame an argument that many blacks were not in fact eligible to serve as grand jurors.[30] Clearly this argument must fail for it is speculative and unsupported in the record. The State points to no specific evidence showing the number of blacks who were in fact not eligible for grand jury service. On the other hand, this court has found, on the basis of Hugh Goodwin's testimony, and from the fact that blacks did serve on trial juries, that there were blacks in Kings County eligible for grand jury service. In light of this evidence, and in the absence of any probative evidence to the contrary, it cannot persuasively be argued that the evidence demonstrates that there were not eligible blacks among the, for example, approximately 1,300 adult blacks in Kings County in 1960.

This court concludes the State has not carried its burden of dispelling the inference of discrimination raised by petitioner's evidence. Petitioner's right to equal protection of the laws was violated. The court need now only consider the State's final contention that this constitutional violation does not warrant issuance of a writ of habeas corpus.

## VI

## HARMLESS ERROR

The State argues at great length that even if petitioner's right to equal protection

of the laws was violated by the presence of intentional discrimination in the selection of the Kings County Grand Jury, such discrimination was "harmless" because petitioner is guilty of the charged crime. Accordingly, it argues that the violation of petitioner's constitutional right to equal protection does not justify the granting of a writ of habeas corpus. *See* Closing Argument at 2–9 and 23–35.

The State's argument rests in part upon Justice Powell's concurring opinion in *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), to the effect that Part II of the Court's opinion (holding that a claim of discrimination in grand jury selection is cognizable on federal habeas corpus regardless of the petitioner's guilt or innocence) is not to be given precedential value because it is dictum or because all who joined it did not support the Court's judgment. *Id.* at 582 n. 3, 99 S.Ct. at 3013 n. 3 (Powell, J., concurring in the judgment). *See also United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1120–21 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981) (suggesting that *Rose* did not decide whether a claim of grand jury discrimination is cognizable on federal habeas). For the reasons noted below, the court does not believe it is free to adopt the State's argument, and even if it were free to do so, would reject it.

It should first be noted that the *Barksdale* majority declined to rest its decision on the ground that a claim of grand jury discrimination is not cognizable on federal habeas. *Barksdale v. Blackburn,* 639 F.2d at 1121. More important this court believes, with the judges who dissented in *Barksdale,* 639 F.2d at 1131, that the Supreme Court in *Rose* decided that claims of grand jury discrimination are cognizable on federal habeas, regardless of the guilt or innocence of the petitioner. The argument that discrimination in grand jury selection should not be cognizable on habeas corpus was rejected in

---

**30.** This argument may also be at the root of Judge Wingrove's statement that he had not selected a black for the grand jury panels

"purely through lack of ability to find one [he] fe[lt] would make a proper grand juror."

*Rose* by five members of the Court (Justice Blackmun wrote the opinion and Part II was concurred in by Justices Brennan, Marshall, White, and Stevens). This court is bound by the *Rose* majority.

Even if this court were "writing on a clean slate," it would still find that such a claim justifies the issuance of a writ of habeas corpus. My reasons are essentially those articulated by the *Rose* majority. The Court in *Rose* rested its justification for holding jury discrimination cognizable under federal habeas corpus on two separate grounds, deterrence and the integrity of the judicial process. Both justifications apply to the instant case.

The notion of deterrence has two aspects, an effort to deter wrongful conduct on the part of the present defendants and a notion of general deterrence. *See Rose v. Mitchell,* 443 U.S. at 558, 99 S.Ct. at 3001. While the record indicates that blacks have served on Kings County grand juries in the years after petitioner's indictment, this fact speaks only to Kings County's conduct and not to the principle of general deterrence. To the degree that a notion of general deterrence is justified at all, it most clearly should be applicable against government officials who are perforce required to be aware of the law. Moreover the converse is also true. Just as those who know that the fruits of their wrongful conduct will be bitter must pause before committing unconstitutional acts, those who know that their conduct will be unreviewable by a federal court will, to that degree, feel more free to ignore the law of the land.[31] While it is true that race prejudice is irrational, it does not follow that every act of those who are motivated by racial prejudice is equally irrational. Hopefully at least some can be deterred from acting on their prejudice—in any event such is one premise of the law.

Deterrence, however, was not the primary concern of the Court in *Rose v. Mitch-*

*ell.* Rather, the primary reason the Court held that a writ of habeas corpus should issue when there has been discrimination in grand jury selection was its concern with "the appearance of justice" and the "integrity of the judicial process." *Id.* at 555–56, 99 S.Ct. at 3000.

To allow the petitioner to remain incarcerated where the trial itself was set in motion by a body tainted with racial bias would be to condone such behavior and implicitly to wink at 'odious' and 'pernicious' racial discrimination. [*Rose,* 443 U.S.] at 555 [99 S.Ct. at 2999]. It is because racial discrimination in the selection of a jury 'strikes at the fundamental values of our judicial system and our society as a whole' that it is inappropriate to treat it as harmless error . . . . *Id.* at 556 [99 S.Ct. at 3000].

*Villafane v. Manson,* 504 F.Supp. 78, 89–90 (D.Conn.1980); *see also Hill v. Texas,* 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942). The State, in a very real sense, asks the court in the present case to ignore the Constitution. This the court cannot do. To paraphrase the words of Justice Harlan, the proponent before the court is not only the petitioner, but also the Constitution of the United States, to which this court has an overriding responsibility. *See Chessman v. Teets,* 354 U.S. 156, 165, 77 S.Ct. 1127, 1132, 1 L.Ed.2d 1253 (1957).

The application for a writ of habeas corpus is granted. Petitioner shall be released from custody unless a new charging document is filed within ninety [90] days of the date of this order and petitioner is tried on that document in due course.

IT IS SO ORDERED.

---

**31.** As this court observed in a different context "No disrespect for the California courts, or suspicion as to their dedication to [equal protection] is intended . . . I only note that this court has a duty to do national justice and protect rights arising under the Federal Constitution. Moreover, rules of law . . . cannot be tied to local, and perhaps transitory, conditions. In other places, and perhaps other times, local bias may be a more concrete danger, and the federal court's dedication to national justice a more vital necessity." *Lewis v. Time, Inc.,* 83 F.R.D. 455, 463 n. 6 (E.D.Cal. 1979).